## PALMER *v.* COMMISSIONER OF INTERNAL REVENUE.*

No. 19.  Argued October 19, 1937.—Decided November 8, 1937.

* Together with No. 59, *Helvering, Commissioner of Internal Revenue* v. *Palmer,* also on writ of certiorari to the Circuit Court of Appeals for the First Circuit.

*Mr. Robert G. Dodge,* with whom *Mr. Harold S. Davis* was on the brief, for petitioner in No. 19 and respondent in No. 59.

*Assistant Attorney General Morris,* with whom *Solicitor General Reed* and *Messrs. Sewall Key* and *Ellis N. Slack* were on the brief, for respondent in No. 19 and petitioner in No. 59.

MR. JUSTICE STONE delivered the opinion of the Court.

The question for decision is whether a purported sale by a corporation to its stockholders, of shares of stock issued by and acquired from another corporation, the sale being effected by means of an issue to the stockholders of rights to purchase the stock at a named price, is to be

treated as a distribution of corporate earnings taxable as a dividend to the stockholders when received, within the reach of §§ 22 and 115 of the Revenue Act of 1928, c. 852, 45 Stat. 791.

In January, 1929, The American Superpower Company, of which petitioner was a stockholder, acquired through consolidation of public utility corporations, in one of which it in turn was a stockholder, a large amount of the securities of The United Corporation, the latter being received in exchange for stock of the consolidated corporations owned by Superpower. The securities received included shares of the preference stock of United, 2,210,583 shares of its common stock, and 1,000,000 rights to subscribe for United common stock at any time for $27.50 a share. United was incorporated January 7, 1929. The consolidation was effected January 12th, when Superpower became entitled to its allotment of the securities. On January 23, 1929, the board of directors of Superpower, pursuant to a plan to strengthen its cash position and to create a wide market for the stock of United, adopted a resolution offering to its common stockholders of record January 26, 1929, the privilege of purchasing, at $25 a share, one-half share of United for each share of their common stock in Superpower. The privilege was evidenced by negotiable certificates distributed to stockholders about January 31. By their terms they were to become void unless the privilege was exercised by February 15, 1929. On that date petitioner exercised the privilege by purchasing his allotment of 3,198 shares of United at $25 a share. In its books, records and accounts, Superpower treated the transaction as a sale of the United stock, resulting in no change in its net assets or earnings.

The prices received by Superpower for shares distributed to its stockholders represented a substantial profit

to it over cost of the securities which it had exchanged for them. It reported the profit in its 1929 income tax return and paid the tax on it for that year. In computing the tax the commissioner, in allocating the cost of the three classes of securities received from United by Superpower, found it necessary to determine the value of each class of security when received. He did this by finding the total value of the securities and allocating to the common stock a value of $25 a share. On or about January 9th, bankers who were active in promoting the consolidation purchased from United 400,000 shares of its stock at $22.50 per share. Shortly after the adoption by Superpower, on January 23rd, of the plan for distribution of the United stock, an active market developed on the New York Curb Exchange for the sale of subscription rights. On January 25th, 11,000 rights were sold at prices ranging from 11⅝ to 12⅜, making the cost per share to purchasers of the rights, upon their exercise, about $50. On January 28th, 44,000 of them were dealt in on the exchange at prices ranging from 12⅝ to 17½, with a corresponding cost of the shares of from $50 to $60. On January 29th, 30th and 31st, Superpower sold about 9,200 shares of its United stock on the open market at from $50 to $63 per share.

On May 1, 1929, a like privilege to purchase one-fourth of a share of stock of United at $30 a share for each share of Superpower was extended to the stockholders of the latter, as of May 8, 1929, which petitioner similarly exercised on May 24, 1929. On June 5, 1929, a like privilege was given to the common stockholders of Superpower as of June 18, 1929, to purchase stock of Commonwealth and Southern Corporation at $15 a share, which petitioner exercised on July 2, 1929.

Petitioner did not, in 1929, sell or otherwise dispose of any of the shares for which he subscribed, or report their receipt in his income tax returns for that year. The com-

missioner ruled that the rights to subscribe were dividends, and assessed a deficiency against petitioner based on their market value on the respective dates when the stockholders were first entitled to exercise them. The cause was heard by the Board of Tax Appeals upon a stipulation of facts which it adopted as a finding and which specified the facts already detailed. The board held that the distributions were sales of the shares by Superpower to its stockholders, not dividends, and reduced the deficiency accordingly. In reaching this decision the board, upon consideration of all the facts and circumstances attending the issue of the rights by Superpower to its stockholders, found that there was no intention to distribute any of its earnings to stockholders and that the transaction was what it purported to be on its face—a sale to stockholders of part of the corporate assets. As a supporting fact it found that the fair value of the common stock of United during January, 1929, was $25 a share. It concluded that the facts as stipulated and as found by it did not show fair market value of the United stock in May, 1929, or of the Commonwealth and Southern stock in June or July of that year. Upon the entire record it was of the opinion that there was no reason to treat the transaction any differently than as the parties had treated it, as a sale of a part of the assets of Superpower from which no taxable gain would result before the taxpayer sold or otherwise disposed of the shares.

The Court of Appeals for the First Circuit reversed, holding that the distributions were taxable dividends measured by the difference between the value of the several allotments of shares on the respective dates when the rights were exercised and the prices paid for them. 88 F. (2d) 559. In reaching this conclusion the court recognized that the board had found the January, 1929, value of the stock of United to be $25 a share. But it thought that the board in making the finding had disre-

garded the substantial prices at which the rights were sold pending their exercise, denying to them persuasive weight because it had mistakenly assumed that the purported sale could not be treated as a dividend unless there was intention to distribute the corporate earnings. The court held that what was done, and not what was intended, was the decisive factor, and as there was substantial evidence that the stock, when distributed, was worth more than the price received, there was a distribution of corporate assets from earnings, taxable to stockholders as a dividend. It accordingly remanded the cause to enable the board to ascertain the value of the distributed shares on the dates when the rights were exercised (February 15, 1929, May 24, 1929, July 2, 1929).

Both the taxpayer and the commissioner petitioned for certiorari, the one challenging the ruling that the distributions were dividends, and the other assigning as error the failure to hold that the critical dates for fixing the value of the dividends for taxation were either those when the rights were received by the stockholders or when the stockholders first became entitled to exercise them, rather than the times when they were actually exercised. We granted certiorari, because of the importance of the questions in the administration of the revenue laws, and the doubts which have been raised as to their appropriate answers by the varying opinions of the circuit courts of appeals. Compare the opinions below, *Ramapo, Inc.* v. *Commissioner*, 84 F. (2d) 986 (C. C. A. 2d) and *Commissioner* v. *Mayer*, 86 F. (2d) 593 (C. C. A. 7th) with *Helvering* v. *Bartlett*, 71 F. (2d) 598 (C. C. A. 4th) and *Commissioner* v. *Cummings*, 77 F. (2d) 670 (C. C. A. 5th).

By §§ 111, 112 and 113 of the Revenue Act of 1928, profits derived from the purchase of property, as distinguished from exchanges of property, are ascertained and taxed as of the date of its sale or other disposition

by the purchaser. Profit, if any, accrues to him only upon sale or disposition, and the taxable income is the difference between the amount thus realized and its cost, less allowed deductions. It follows that one does not subject himself to income tax by the mere purchase of property, even if at less than its true value, and that taxable gain does not accrue to him before he sells or otherwise disposes of it. Specific provisions establishing this basis for the taxation of gains derived from purchased property were included in the 1916 and each subsequent revenue Act and accompanying regulations.

Section 22 of the Revenue Act of 1928 includes "dividends" in "gross income," which is the basis of determining taxable net income, and § 115 defines "dividend" as "any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits." While a sale of corporate assets to stockholders is, in a literal sense, a distribution of its property, such a transaction does not necessarily fall within the statutory definition of a dividend. For a sale to stockholders may not result in any diminution of its net worth and in that case cannot result in any distribution of its profits.

On the other hand such a sale, if for substantially less than the value of the property sold, may be as effective a means of distributing profits among stockholders as the formal declaration of a dividend. The necessary consequence of the corporate action may be in substance the kind of a distribution to stockholders which it is the purpose of § 115 to tax as present income to stockholders, and such a transaction may appropriately be deemed in effect the declaration of a dividend, taxable to the extent that the value of the distributed property exceeds the stipulated price. But the bare fact that a transaction, on its face a sale, has resulted in a distribution of some of the corporate assets to stockholders, gives rise to no inference

that the distribution is a dividend within the meaning of § 115. To transfer it from the one category to the other, it is at least necessary to make some showing that the transaction is in purpose or effect used as an implement for the distribution of corporate earnings to stockholders.

The facts stipulated and the finding of the fair market value of the United stock at the time of the adoption of the first plan for its distribution abundantly sustain the board's conclusion that the transaction—in form a sale—was not intended to be the means of a distribution of earnings to stockholders. There may be cases in which market quotations, after the subscription rights have been issued, are persuasive evidence of value as of the time when the plan was adopted, and hence of its purpose and probable effect. But we cannot say that the board here, in finding the value of the shares of the newly organized United as of the time of adoption of the first plan, did not consider the market prices of the rights. The findings are inferences which the board was free to draw from all the facts and circumstances disclosed by the record. Such a determination of fact is not to be set aside by a court even if upon examination of the evidence it might draw a different inference. *Helvering* v. *Rankin*, 295 U. S. 123, 131, 132; *Elmhurst Cemetery Co.* v. *Commissioner*, 300 U. S. 37. We accept the findings as at least establishing that the plan was adopted by Superpower in good faith as a means of effecting a sale of its assets to stockholders at fair market value. Hence the issue for decision, in so far as the first allotment of stock is concerned, is narrowed to the question of law whether the commitment of Superpower, by formal action of its board, to the sale of United stock at its then fair market value and the ensuing distribution to stockholders is taken out of the category of sales and placed in that of dividends by the fact that, pending execution of the

project, rights to subscribe sold on the exchange at substantial prices, or that the stock itself sold at prices substantially above the stipulated purchase price.

*First.* The mere issue of rights to subscribe and their receipt by stockholders, is not a dividend. No distribution of corporate assets or diminution of the net worth of the corporation results in any practical sense. Even though the rights have a market or exchange value, they are not dividends within the statutory definition. Cf. *Miles* v. *Safe Deposit & T. Co.,* 259 U. S. 247; *Helvering* v. *San Joaquin Co.,* 297 U. S. 496; *Helvering* v. *Bartlett, supra.* They are at most options or continuing offers, potential sources of income to the stockholders through sale or the exercise of the rights. Taxable income might result from their sale, but distribution of the corporate property could take place only on their exercise. The question, then, is whether the distribution which results from the exercise of the rights must be regarded as a dividend if the reasonable value of the property at the time of exercise is more than the purchase price.

*Second.* We think that a distribution of assets by a corporation to its stockholders by means of a sale, to which it is committed by appropriate corporate action at a time when their sale price represents their reasonable value, is not converted into a dividend by the mere circumstance that later, at the time of their delivery to stockholders, they have a higher value. The meaning of § 115 must be sought in the light of the situations to which it must be applied. It does not purport to withdraw corporations and their stockholders wholly from the operation of §§ 111, 112 and 113, taxing the profits of purchasers. It cannot be taken to withhold from corporations the power at their own election to effect, by workable means, sales of their assets to stockholders at fair value, subject to that incidence of taxing statutes which usually attends sales. The distribution contem-

plated and defined by it as a dividend is one to be effected by corporate action. Hence, in determining whether a given transaction is "sale" or "dividend," the corporate action which results in one or the other must be scrutinized in the light of the circumstances at the time when the action is taken, and of the conditions under which in practice it must be taken.

The only feasible method by which a corporation of large membership can effect a sale of its assets to stockholders is by tendering to them rights to subscribe, a method whose indispensable first step is the adoption, by appropriate corporate action, of the terms of the offer. Between the dates of the first step and of subscription a substantial period of time must elapse, during which the rights may, and often do, become the subject of violent market fluctuations. Any vendor who offers property for sale at a named price similarly carries the burden of risk that the property may increase in value between offer and acceptance. If the sale is by executory contract he also carries the risk between promise and performance. It is an inseparable incident of every sale except those in which conditions admit of payment for the property simultaneously with its tender for sale, a procedure which may not be available to a corporation seeking to sell its property to stockholders.

It is a solecism to speak of a corporation as distributing its profits for the sole reason that, after it has unavoidably assumed that risk in order to effect a sale of its property to stockholders at a fair price, the property increases in value. Price, which in the present case is decisive of the issue, must be determined in the light of the situation existing when price is fixed. If the option price is fair when fixed the transaction is a tender for a sale and not for a distribution of profits—a dividend as defined by § 115. If, pending execution of the plan. there were no change in value of the stock the transac-

tion would throughout concededly retain its character as a sale. Its character is not altered by the fluctuations of a speculative market, after the corporate action which defines the character of the transaction has been taken.

When the corporation has committed itself to a sale of its assets to stockholders at present market value the effect on its balance sheet is the same as in the case of other vendors who in various ways assume the risk of rising prices pending the consummation of the sale. In every case purchasers may, as a result of market change, acquire property at less than its value at the date of acquisition. But in the case of the corporation it does not follow that there has been a distribution of its profits. It can hardly be said that profits accrue to a corporation from a fortuitous gain in market value, the benefits of which it has relinquished before the gain occurs. Distribution of profits is neither the purpose nor effect of the action taken by the corporation and there is no adequate basis for saying that the transaction to which the directors committed their corporation was the distribution of earnings, and hence a dividend rather than a fairly conducted sale of corporate property with all the incidents which usually attend a sale when the price is fixed in advance of performance. It is decisive of the present case, so far as the first allotment of United shares is concerned, that distribution of corporate assets, effected by the sale, was not intended to be a means of distributing earnings, and that the price when fixed represented the fair market value of the property to be distributed.

There has been no finding, either by the commissioner or the board, of the fair market value of the United stock in May or of the Commonwealth & Southern in June, the months when the plans for the second and third allotments of the shares were adopted. The finding of the board that the facts as stipulated were not

sufficient to establish fair market value of the shares on those dates furnish sufficient support for its conclusion that there was no basis for treating the transactions, which were on their face sales, as distributions of earnings and hence dividends as defined by § 115.

The writ in No. 59 is dismissed and in No. 19 the judgment is

*Reversed.*