William J. HAAG and Edith C. Haag, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

E. B. SEWALL MANUFACTURING COMPANY, Respondent.

Nos. 17585, 17586.

United States Court of Appeals Eighth Circuit.

July 16, 1964.

Fred A. Kueppers and D. D. Daly, St. Paul, Minn., for petitioners William J. Haag and Edith C. Haag and respondent E. B. Sewall Mfg. Co.

Harry Marselli, Attorney, Tax Division, Dept. of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., Lee A. Jackson, I. Henry Kutz and Martin B. Cowan, Attorneys, Department of Justice, Washington, D. C., on the brief, for Commissioner of Internal Revenue.

Before VOGEL, MATTHES and RIDGE, Circuit Judges.

MATTHES, Circuit Judge.

Case No. 17,585 involves an income tax deficiency assessment against petitioners William J. Haag and Edith C. Haag for the calendar year 1957. The Commissioner of Internal Revenue determined the deficiency to be $110,313.88, and the Tax Court—after trial—found the deficiency amounted to $50,666.05. The theory of the Commissioner and the Tax Court is that William J. Haag (Haag) realized ordinary income as the result of a transaction whereby he became reinvested with record title to certain real estate from E. B. Sewall Manufacturing Company (Company) on September 1, 1957.

Case No. 17,586 involves a question whether Company sustained a deductible loss of $13,611.29 when it transferred title to the real estate to William J. Haag on September 1, 1957.

The proceedings were consolidated for trial in the Tax Court, and in accordance with the concessions of the parties that the result to be reached in the Sewall case (17,586) was conversely controlled by the decision in the Haag case (17,585), the court in finding a deficiency against Haag decided that Company was entitled to the $13,611.29 deduction.

Haag filed a petition for review of the decision in No. 17,585, and the Commissioner filed a protective petition for review of the decision in No. 17,586. The cases were consolidated in this court and the parties are again in agreement that if the Tax Court's decision in No. 17,585 is sustained, then Company is not liable for a deficiency and the Tax Court should be affirmed in its findings that Company is entitled to the deduction.

No basic fact issue is in dispute. However, certain inferences and conclusions which legitimately flow from the facts are questioned. Inasmuch as no challenge is made to the facts as stated and found by the Tax Court, we adopt the substance of its factual statement appearing in its opinion, 40 T.C. 488 (1963).

William J. Haag and Edith C. Haag, husband and wife, filed their joint return for the tax year in question. William J. Haag kept his records and reported his income on a cash basis for the calendar year.

With the exception of one qualifying share, Haag and E. B. Sewall were the sole shareholders of Company. Haag owned 416 shares representing 40.82% of the common stock, was vice-president of Company and in charge of Company's financial matters. Sewall, owning approximately 60% of the issued stock, was president of Company and in charge of Company's shop.

For many years Company had rented the real estate used for its manufacturing business from Haag. In 1951, it was in need of additional production facilities as well as working capital. After unsuccessful efforts were made to obtain loans through commercial channels, application was made to the Reconstruction Finance Corporation (RFC) for a loan in the amount of $150,000. The loan was authorized in 1952 on condition that Company acquire the title to the real estate previously rented from Haag. It was also specified that substantial improvements to the real estate be made.

Due to Company's lack of cash, the acquisition of the property became a problem. RFC would not approve a plan whereby Company would issue its notes for the purchase price because this would increase the corporate liability. Additionally, E. B. Sewall desired to

retain control of Company and therefore would not issue common stock to Haag for the property. After negotiations, it was decided that Haag would convey the property to Company in exchange for preferred stock and assumption of the existing mortgage, with an option given to Haag to reacquire the property when the RFC loan was paid off.

On August 6, 1952, Haag and Company entered into an "Agreement To Sell And Option To Repurchase Real Estate," and contemporaneously Haag deeded the property to Company. In consideration for the transfer, Company issued to Haag 520 shares of its preferred stock having a par and fair market value of $52,000, and Company assumed the then existing mortgage against the property on which there was an unpaid balance of $22,000. In the agreement, Haag was given the option to repurchase the property upon repayment of the loan to RFC and for one year thereafter, for the same amount at which he sold it—$74,000. The agreement also provided that Company could not sell the property or any part thereof to anyone other than Haag and that he could pay any part of the repurchase price by signing over to Company any shares of the preferred stock at its par value which were then held by Haag.

Shortly after the conveyance of the real estate to Company, it became necessary for Haag to pay $2,000 toward the reduction of the mortgage and as a result the option agreement was amended on August 27, 1952, to reduce the option price to $72,000. The value of the property at the time of transfer on August 6, 1952, was $72,000.

Petitioners Haag reported the sale and option to repurchase transaction with Company on their 1952 income tax return as follows:

Computation of sales price below mortgage  
    assumed by purchaser ...................... $20,000.00  
Value of stock given in exchange .............. 15,312.44  
                   Total sales price ............ $35,312.44

Factory building at 649 Glendale St., St. Paul,  
    Minn., acquired 11-1-42, Sold 8-6-52:  
        Sales price .............................. $35,312.44  
        Depreciation allowed ..................... 13,253.61  
        Cost .................................... 48,566.05  
        Gain or loss ............................. None

No value for the so-called "option" was reported as consideration or as having been received as part of the purchase price for the sale.

As another condition of obtaining the loan from RFC, Company was required to use the proceeds of the $150,000 loan as follows:

(a) $70,000 to construct Building No. 5 which was an addition to Building No. 4.

(b) $20,000 to pay off the current mortgage on the property.

(c) $60,000 for current operating expenses.

The $150,000 loan obtained by Company from RFC was evidenced by a promissory note and secured by a first mortgage on the property acquired from Haag.

After the loan was received, Company improved the property by making the addition specified in the conditions of the loan. The cost of improvements and additions to the property totaled $92,741.59. Of this sum $42,044.19 was spent in the remaining four months of 1952, and $47,923.57 was spent the following year. During the five-year period of the loan, Company paid all taxes,

insurance and other expenses of maintaining the property.

In August, 1957, Company completed repayment of the RFC loan, and Haag immediately notified Company of his intention to exercise his option. On September 1, 1957, Company deeded the property to Haag, and at that time Haag paid the agreed purchase price of $72,000 by surrendering the 520 shares of preferred stock for which he was credited with $52,000, plus $15,600 for accrued but unpaid dividends on the stock, plus $1,872 for interest on the unpaid dividends, and by issuing his check in the amount of $2,528. On the same day Haag agreed to lease the property once again to Company for $1,800 a month beginning on that date. During the period that Company held title to the property, Haag did not receive any rent or other compensation for use of the property. On September 1, 1957, Company had an income tax basis for this property of $85,611.29, but the fair market value of the property was then $150,000.

Upon the foregoing facts, the Tax Court found that when Haag received his property back in 1957 with the improvements and additions thereon and with an accordingly increased valuation at the price agreed upon by the parties five years before, he realized ordinary taxable income of $78,000, the difference between the then value of the property and the "prearranged bargain price he was enabled to pay."

In urging that the decision of the Tax Court in Case No. 17,585 should be reversed, petitioners maintain that they did not realize taxable income in 1957 as the result of the purchase of the property by Haag from Company because: (1) the transactions between Haag and Company in 1952 and in 1957, respectively, constituted legitimate, arm's length sales of real estate; and (2) alternatively, even if—as held by the Tax Court—the two transactions are to be treated as a single arrangement in the nature of a loan of the real estate by Haag to Company, the compensation received by Haag was the option granted to him on August 6, 1952, and was taxable at that time and not in 1957 when he exercised it. As to their first contention, petitioners argue that it was the intention in 1952 of Company to purchase and Haag to sell the property; that the agreement between them expresses and evidences such intention, and the transaction in fact was a sale; that the agreement was the result of arm's length negotiations between Sewall and Haag; that the foregoing is supported by substantial evidence whereas there is no basis in fact or law to justify a finding of a loan arrangement; and that since the 1952 transaction involved a sale by Haag, the 1957 transaction necessarily involved a purchase by him and as such was not a taxable event. In their alternative argument, petitioners assert, in summary, that it must have been the intention of Company to compensate Haag for the use of the real estate; that the option contained in the 1952 agreement was property which constitued such compensation; that this compensatory option had a fair market value of $10,000 at the time of its grant in 1952; and that under the regulations applicable to the taxing of compensatory options having a fair market value at the time of grant, Haag realized ordinary taxable income in 1952 and not in 1957.

In our view, the answer to the underlying question whether acquisition by Haag in 1957 of legal title to the real estate having a value of $150,000—$78,000 in excess of its value when Haag parted with title thereto in 1952—constituted taxable income within the framework of our tax laws, depends upon the realities of the transaction viewed in totality. If, as urged by the Commissioner, the transfer of title to Company in 1952 and retransfer back to Haag in 1957 was in substance only an accommodation or mechanical arrangement designed to permit Company to obtain the loan from RFC, and was not a bona fide sale and resale, then Haag's position is untenable.

General legal principles applicable here stand uncontroverted. Profits derived from an arm's length purchase of property are ascertained and taxed as of the date of the subsequent sale or other disposition of the property by the purchaser. Palmer v. Commissioner, 302 U.S. 63, 68–69, 58 S.Ct. 67, 82 L.Ed. 50 (1937). And in Commissioner v. Lo-Bue, 351 U.S. 243, 248, 76 S.Ct. 800, 803, 100 L.Ed. 1142 (1956), the Supreme Court stated:

> "It is true that our taxing system has ordinarily treated an arm's length purchase of property even at a bargain price as giving rise to no taxable gain in the year of purchase. See Palmer v. Commissioner of Internal Revenue, 302 U.S. 63, 69, 58 S.Ct. 67, 69, 82 L.Ed. 50. But that is not to say that when a transfer which is in reality compensation is given the form of a purchase the Government cannot tax the gain under § 22(a). The transaction here was unlike a mere purchase."

Mertens Law of Federal Income Taxation, Vol. 1, § 5.13 (Revised, 1962), cited and relied upon by Haag, gives recognition to the principle in this language:

> "No taxable income ordinarily results from the purchase of property assuming that the transaction is one at arm's length and that the relationship of the parties does not introduce into the transaction other elements indicating that the transaction is not simply a purchase but involves an exchange of other considerations. It requires strong evidence to rebut the presumption that what appears to be in good faith a purchase is not such. Except in the important situations where stockholders and employees are involved, the fact that the property may be acquired at a bargain price or one below its fair market value does not require a departure from this rule."

In determining the taxability of a transaction, the substance of the transaction as revealed by the evidence as a whole controls over the form employed; i. e., the veil of form is pierced and the entire transaction is carefully scrutinized. United States v. Cumberland Public Service Co., 338 U.S. 451, 454, 70 S.Ct. 280, 94 L.Ed. 251 (1950); Commissioner v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945); Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 255, 60 S.Ct. 209, 84 L.Ed. 226 (1939); Smith's Estate v. C.I.R., 8 Cir., 313 F.2d 724, 730 (1963).

It is, of course, true that facially the documentary evidence, consisting of the option agreement and the two deeds executed pursuant thereto (Haag to Company in 1952, Company to Haag in 1957), all regular and in proper form, supports Haag's theory. Additionally, there were negotiations between Haag and E. B. Sewall which culminated in the option agreement and the transfers of titles by deeds. But that is not the whole picture. As pertinently observed by the Tax Court, the significant pre-existing relationship between Haag and Company was that of lessor and lessee. Prior to 1952 Haag as owner rented the property to Company. In that year the relationship of the parties, on the surface, changed as the result of Company's need for additional funds for expansion and working capital which RFC was willing to furnish to Company in the form of a loan on condition, however, that Company was the owner of the real estate. It is also of significance that in 1952 Haag, owner of approximately 40% of the stock of Company, was vice-president and in charge of "finance control." As Haag testified, "I handled all the financial details of the Company, all sales, and anything that had to with general management. Mr. Sewall's time was spent practically 100% in the operation of the shop * * *." In that capacity, Haag did the negotiating with RFC for the loan, he prepared the application for the loan, and it appears that he initiated or at least actively participated in working out the plan, after others had been disapproved by RFC, whereby Company ac-

quired title to the real estate, thus bringing into fruition the $150,000 loan from RFC.

Although Haag and Company were fully aware that the loan was obtained from RFC on condition that $70,000 would be used for capital improvements, thereby logically dictating that the value of the property would be enhanced, the option price was pegged at $72,000.[1] In 1957, Haag was enabled to reacquire title to the property having an agreed value at that time of $150,000 for a consideration of $72,000.

Furthermore, the mode of payment of the consideration for the transfers deserves comment. Under the plan, no outlay of funds was required by Company when it acquired the property in 1952. The purchase price was discharged by issuance of preferred stock having a value of $52,000 and by assumption of the unpaid balance on the mortgage. In 1957, when the property was conveyed back to Haag, the $72,000 consideration agreed upon was discharged by surrender of the preferred stock of the agreed value of $52,000, the accumulated dividends with interest thereon, and a cash payment of only $2,528. The plan conceived by the parties for satisfying the purchase price of each transaction, while legitimate, is another circumstance which the Tax Court was entitled to consider in resolving the question of taxability of the transaction.

The final link in the chain of circumstances also has appealing force. For we see that immediately upon the option becoming exercisable (payment in August, 1957 of final installment of RFC loan), Haag notified Company of his intention to exercise his right to reacquire title to the property. On September 1, 1957, the right became a reality by the conveyance of record title to the property back to Haag, and on the same date Haag leased the property to Company for $1,800 per month, thereby openly recreating the landlord-tenant relationship which had existed prior to the conveyance in 1952.

■ From the overall picture, there is certainly room for the fact-finding tribunal to logically infer and find that the plan was designed to assist Company in procuring the much needed loan; that the parties agreed upon the details and route whereby Company became vested with the legal title in order that the paramount feature of the plan could be materialized; that the property was in effect loaned to Company and in consideration Haag was to and did reacquire the property at its greatly increased value; and that such increase was to compensate Haag for his loss of rental income during the five-year period that the title was held by Company.[2]

Proceeding to the alternative argument, we observe that petitioners rely on those regulations and cases which announce the rule that a compensatory option having a fair market value at the time of grant is taxable both to employees and to independent contractors at the time of receipt, and not when exercised. See, Treas.Reg. §§ 1.61–2(d), 1.61–15, and 1.421–6 (1963);[3] e. g., McNamara v. Commissioner, 7 Cir., 210 F.

1. As we have seen, the original option fixed the price at $74,000. However, because Haag thereafter paid $2,000 toward the reduction of the mortgage, the agreement was amended to reduce the option price to $72,000. The cost of improvements and additions to the property exceeded $92,000.00.

2. The Tax Court analyzed the evidence in support of its conclusion in the following language: "In place of rent over the 5-year period, Haag in effect received $15,600 in dividends on the preferred stock he acquired in 1952 and $1,872 in accrued interest thereon, plus the $78,000

of added value to the property. When spread over the 5-year period, this amounts to approximately $1,600 per month, if no interest factor is considered. Taking into account that Haag was also relieved of the costs of insurance, taxes, and maintenance during this period, the total he received is obviously comparable to the new rental of $1,800 per month at which the property was re-rented to Sewall immediately upon exercise of the option."

3. While these regulations may not be technically applicable for the years involved in this case, they are referred to

2d 505 (1954) ; Commissioner v. Stone's Estate, 3 Cir., 210 F.2d 33 (1954) ; and Colton v. Williams, N.D.Ohio, 209 F. Supp. 381 (1962). Of course, petitioners premise their contention on the assumption—which they maintain is supported by the evidence—that the option is a compensatory option and within the rule applicable for taxing such options granted to independent contractors and lenders. Specifically, they claim that the option was granted as compensation for use of the premises; that it had no restrictions upon it and was clearly assignable; that it had a value of $10,000 when received by Haag in 1952; and that therefore it was taxable in that year and not in 1957.[4]

The Commissioner takes no issue with the validity of the legal pronouncement that a compensatory option having a readily ascertainable fair market value when granted is taxable only at that time, and indeed, cites Commissioner v. LoBue, supra, 351 U.S. 243, 76 S.Ct. 800, where the Supreme Court stated in regard to stock options:

"It is of course possible for the recipient of a stock option to realize an immediate taxable gain. See Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 181–182, 65 S.Ct. 591, 593, 89 L.Ed. 830. The option might have a readily ascertainable market value and the recipient might be free to sell his option." 351 U.S. at 249, 76 S.Ct. at 804.

However, the Commissioner most strenuously opposes petitioners' assertion that

here the *grant* of the option was intended to be the compensatory event and that the option had a readily ascertainable fair market value at that time. It is the Commissioner's position that the option utterly failed to satisfy the criteria for establishing "readily ascertainable fair market value" at the time of the grant in 1952. He points out—referring to criteria set forth in the regulations—that the option, among other shortcomings, was not immediately exercisable, since exercise was postponed until the RFC loan was repaid and could be further postponed by extension of time; that while Haag may have had the legal right to sell the option, it is highly doubtful under the circumstances that anyone having no control over the Company would be interested in a bona fide purchase of the option; and that the value of the option privilege to anyone other than Haag was completely speculative.[5]

We need not delve deeply into the merits of the applicability of the above legal pronouncements nor of the factual contentions of the parties relating to the taxability of options having a readily ascertainable fair market value at the time of their issuance. For, in our view, once it is determined—as we have—that the 1957 transaction did not amount to an arm's length purchase, and the 1952 transaction did not result in an arm's length sale, it necessarily follows that neither was there an arm's length option to purchase. After careful scrutiny of the record, we have determined that there is substantial evidence to support

by both parties. The Commissioner concedes that such regulations "aptly restate the pre-existing law," and petitioners rely heavily upon them, setting forth a summary of Technical Information Release No. 490 issued in conjunction with the regulations.

4. Petitioners state in their brief that the fact that they "did not report the receipt of the option as income in 1952 * * * does not change the character of the transaction."

5. Petitioners maintain that the phrase "readily ascertainable fair market value"

was first used in the regulations in 1961, and "was taken from a chance phrase in LoBue," supra, 351 U.S. 243, 76 S.Ct. 800. As previously noted, petitioners have relied on various regulations, but they discount the applicability of the "stringent conditions of Regulation 1.421–6" for determining "readily ascertainable market value," stating, "By its very terms, Regulation 1.421–6(a) (2) (i) limits the readily ascertainable market value provisions of the regulations to transactions occurring after September 25, 1959."

the Tax Court's conclusion that the so-called option was merely part of the financial arrangement to assure that the compensation—in the form of improvements to be erected on the property—would be given to Haag at the agreed time. We are in full accord with the following pronouncements of the Tax Court:

"The record convinces us that the parties did not contemplate or intend that the 'option' was given to compensate Haag for the use of his property by Sewall [Company] for the 5-year period. It was merely a mechanical device to insure the return of his property to Haag after the RFC loan had been paid off. The intention of the parties was to compensate Haag for the use of his property by returning the improved and more valuable property to him at the end of the term when the 'option' was exercised. The option itself was merely a cog in the financial arrangement machinery; it had no economic significance when granted.

"The significant economic event occurred when Haag exercised his right to repurchase the improved and more valuable property at the pre-determined bargain price. This was the taxable as well as the economic event and the substance of the entire transaction, of which the 'option' was merely an incidental mechanical step. Even if we found the option to be bona fide and exactly what it purports to be, which we do not, it was not intended to be compensation until its exercise in 1957, and therefore the bargain purchase is taxable in that year. * * *

The petitioners' reliance upon stock-option cases holding that some such options constitute compensation when received is misplaced, and the cases relied upon are distinguishable. We hold, instead, that the 'option' was not bona fide, as such, but simply a part of the financial arrangement by which Haag was to be compensated for the loss of rent and for the use of his property until the loan from RFC was repaid.

"* * * Since the taxpayer is on the cash basis and the payment was not received by him until 1957, it is taxable in that year."

In summary, we hold that there is substantial and adequate evidence to support the findings of the Tax Court in Case No. 17,585, that those findings are not clearly erroneous, and that the decision of the Tax Court is entitled to affirmance. Since we have concluded that the decision in Case No. 17,585 is correct, it necessarily follows—as stipulated in regard to Case No. 17,586—that the $13,611.29 loss sustained by Company when it transferred title to the property to Haag in 1957 was a deductible loss. Accordingly, the decisions of the Tax Court in Cases Nos. 17,585 and 17,586 are

Affirmed.