LEISURE DYNAMICS, INC., (Formerly
Lakeside Industries, Inc.),
Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

No. 73-1437.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 11, 1973.

Decided April 2, 1974.

Stuart, District Judge, dissented
and filed opinion.

Richard N. Flint, Minneapolis, Minn.,
for appellant.

James H. Bozarth, Atty., Tax Div.,
Dept. of Justice, Washington, D. C., for
appellee.

Before BRIGHT and STEPHENSON, Circuit Judges, and STUART, District Judge.*

BRIGHT, Circuit Judge.

In 1965, taxpayer-appellant, Leisure Dynamics, Inc. (formerly Lakeside Industries, Inc.), a toy manufacturer, paid $102,676.45, for the right to manufacture dolls in the likeness of animated doll characters known as "Gumby" and "Gumby's Pal, Pokey" (a horse) that have appeared on television cartoon series entitled "The Adventures of Gumby." Taxpayer considered this sum of money a royalty payment and therefore deductible from gross income. The Commissioner denied this deduction, asserting that the payment represented a capital investment, i. e., an installment paid toward the purchase of rights to manufacture the doll. Taxpayer unsuccessfully contested the Commissioner's ruling in the tax court[1] and now appeals.[2] We reverse.

This case raises a not unfamiliar problem which has plagued the Commissioner, the tax court, and federal courts —the proper tax treatment to be afforded parties to a contract effecting a transfer of franchises, trademarks, or trade names.[3]

The facts here as stipulated and as developed through testimony and exhibits show that in the mid-1950's Arthur and Ruth Clokey developed the animated cartoons starring "Gumby" and "Gumby's Pal, Pokey" by photographing the dolls against a three-dimensional background and moving them a fraction of an inch in each frame of film. With the assistance of E. Roger Muir, a National Broadcasting Company television executive, the cartoon was telecast nationally on network television. Later, on December 7, 1957, the Clokeys and Muir joined together to form Clokey Productions, Inc. (hereinafter Productions). Productions edited the films into five-minute strips and attempted to syndicate them with individual television stations in the United States. Although some stations purchased the Gumby episodes, most stations were unwilling to pay cash for the cartoons. Instead, they gave Productions free advertising on television or what is known as barter time in exchange for the use of the cartoons.

* WILLIAM C. STUART, District Judge, Southern District of Iowa, sitting by designation.

1. Unofficially reported at 32 T.C.M. 159; T.C. Memo. 1973–36 (Feb. 14, 1973). It should be noted that the Commissioner originally assessed a deficiency of $148,229.83, in the income tax of appellant for the taxable year ending December 31, 1965. Included in this 1965 determination was a disallowance of a tentative net operating loss carryback from the taxable year ending December 31, 1968, attributable to a similar "royalty" payment in 1968. Prior to trial the parties entered into a stipulation for taxes owed on the disallowance of the deduction.

2. Our jurisdiction arises under 26 U.S.C. § 7482.

3. The transaction here in question predates Congress' recent consideration of the problem in its enactment of § 516(c) of the Tax Reform Act of 1969, now 26 U.S.C. § 1253.

While this section is therefore inapplicable to this case, the Senate Report on the proposed measure noted the then-confused status of the law which we must consider:

It is difficult to resolve under present law whether the transfer of a franchise, trademark, or trade name is to be treated as a sale or as a license, and whether the transferors are selling franchises, trademarks, and trade names in the ordinary course of business. Depending upon how these questions are resolved, the transferor will receive ordinary income or capital gains treatment on the gain he realizes on the transfer. At present, these problems must be resolved under general tax principles, and this has produced differing results in the courts, despite factual similarities in the interest of the franchises, trade marks, or trade names transferred. [1969 U.S.Code Cong. and Admin. News p. 2241, S.Rep.No.91–552, 91st Cong., 1st Sess. (1969).]

The enactment of § 1253 brings greater certainty to this area of tax law.

Initially, the Clokeys refused offers of barter time because they had no products to sell; however, in early 1964, the Clokeys decided to try to use the barter time to sell Gumby dolls which had been manufactured by others. The response to a single commercial run in Los Angeles in March of 1964, was so extraordinary that the Clokeys decided that expert help was needed to produce and promote the dolls.

This success induced the Clokeys and Wallace J. Seidler, an advertising agent experienced in the toy field, his wife, Edward S. Kellogg, Seidler's associate in the advertising business, and Mrs. Kellogg to incorporate Gumby Toy Company, Inc. (hereinafter Toy) on June 4, 1964. They planned to distribute Gumby dolls on a royalty-free license from Productions which was the owner of the rights to the characters in the Gumby cartoon. However, neither Productions nor Toy actually manufactured or packaged the Gumby toys; these functions were performed by unrelated companies.

In early 1965, the taxpayer (then Lakeside) learned of the marketing success of the Gumby doll in Los Angeles. Taxpayer became interested in marketing the dolls and first negotiated with the owners of Toy to purchase the capital stock of the corporation for $500,000, plus royalty payments for sales in excess of $7,500,000 during seven years. Concomitantly, taxpayer and Productions also negotiated for an agreement to insure that Gumby would receive continuous television exposure. The former negotiations for stock purchase broke down when taxpayer learned that Gumby might not be protected by copyrights. Nonetheless, taxpayer continued its interest in acquiring rights to manufacture and market Gumby.

The parties continued negotiations and ultimately agreed on a contract, the terms of which underpin the present dispute. This contract, dated February 24, 1965, was labeled "Purchase Agreement & Security," and in substance, transferred from Toy as Seller to taxpayer as Buyer, the trademark and trade names "Gumby," "Gumby's Pal, Pokey," other trademarks and trade names identifying characters from the television series "The Adventures of Gumby," and granted the Buyer the right to manufacture and sell products based on such characters. By this contract Toy also transferred its tools and dies to taxpayer.

The agreement called for payment of $50,000 cash, plus delivery by taxpayer of 20,000 shares of its stock to Toy. The contract also provided for additional payments said to be "On account of the purchase price" based upon 6.6 percent of taxpayer's net paid sales (cash received by Lakeside from sales to its customers excluding rebates, returns and allowances) of the products covered by the contract, but during the first year, no additional payment was required unless such sales of any of the Toy products exceeded $750,000. Additionally, taxpayer guaranteed that it would sell 3,600,000 units the first year or pay the Seller 6.6 percent of the "arbitrary sales price" of 45 cents per unit on this minimum number of units. A lesser number of units was guaranteed for subsequent 12-month periods until March 31, 1970. The taxpayer also agreed to pay Toy 50 percent of its gross receipts derived from any sublicense agreements.

The contract also contained provisions for an accounting between the parties, for cooperation in trademark infringement suits and for Seller to terminate the agreement and retake possession of assets upon Buyer's default. Seller agreed to take reasonable steps to ensure that Productions would continue to exhibit "The Adventures of Gumby" on television stations throughout the world.

The board of directors of Toy agreed to dissolve the corporation on February 23, 1965, the day before the execution of this contract. By an agreement entered

into a month later, the proceeds of the Gumby contract were divided between the parties involved in Productions or Toy as follows:

|  | Ownership of Toy | Ownership of Productions | Percentage of Gumby Royalties Payable |
|---|---|---|---|
| Ruth Clokey | } 55% jointly | 33⅓% | 23.5% |
| Arthur Clokey | | 33⅓% | 23.5% |
| Edward S. Kellogg | 25% | None | 23% |
| E. Roger Muir | None | 33⅓% | 10% |
| Wallace J. Seidler | 20% | None | 20% |

The contract was amended in January of 1966, to reduce the percentage payment to 3.3 percent on some of the doll products other than "Gumby and Gumby's Pal, Pokey." In August of 1966, the successors to Toy and taxpayer modified the contract to grant taxpayer the right to enter into sublicenses, joint ventures, and agreements with independent agents without requiring prior approval from the successors to Toy.

The trial testimony disclosed that the sales of Gumby toys rested upon promotion of the toys in connection with children's television programs showing the syndicated Gumby cartoons. Sales were excellent during 1965, 1966, 1967, and 1968, but thereafter declined. The taxpayer found that the Gumby cartoon could not be re-syndicated in some markets where sales of Gumby toys had been successful on prior occasions, and that in other markets the Gumby promotions did not produce an adequate return on the advertising investment. The taxpayer then terminated its promotions.

We are concerned here with payments made by the transferee for the rights to manufacture "Gumby" based on transferee's sales of dolls. It is easy to state but difficult to apply the rule of law which determines whether such payments by the transferee constitute part of a sale, to be treated as nondeductible from gross income by the transferee and accounted for by the transferor as capital gains income, or a license, entitling the transferee to deduct payments as a cost of doing business and requiring the transferor to account for such receipts as ordinary income.

As recognized by the tax court in this case and as is conceded by the appellant, the general rule to be followed in determining whether the transaction should be treated as a license rather than a sale rests on whether the seller, Toy, and its successors "retained and exercised an active and continuing operational interest in the Gumby trademarks and in taxpayer's business." [4] The tax court recited the rule as follows:

Although the courts have struggled to define the amount of control necessary to turn an apparent sale into a license,

4. In its explanation of the provisions of § 516 (c) of the Tax Reform Act of 1969 concerning the tax treatment of transfers of franchises, trademarks, and trade names, the Senate Committee on Finance aptly summarized the then existing law as follows:

For a transaction to receive capital gains treatment, property which is transferred must generally constitute a capital asset and must be sold or exchanged. It has been fre-

quently necessary for the courts to determine whether a variety of conditions included in the agreement between the transferor and the transferee transform a purported sale into a license, thus requiring the gains from the transaction to be taxed as ordinary income.

This question has resulted in a division of authority among the courts, some finding a sale and others a license. In either case, the

retention by the transferor of a substantial right in the transferred property or the continued participation of the transferor in the transferee's business is the touchstone of a license. See Dairy Queen of Oklahoma v. Commissioner, 250 F.2d 503 (C.A.10, 1957); Gowdey's Estate v. Commissioner, [307 F.2d 816 (4th Cir. 1962)]; Schmitt v. Commissioner, 271 F.2d 301 (C.A. 9, 1959); United States v. Wernentin, [354 F.2d 757 (8th Cir. 1965)].

This circuit through an opinion authored by Judge (now Justice) Blackmun summed up the problem facing the courts in cases of this kind in this way:

> One could say that in these cases the courts appear to be struggling to accommodate, on the one hand, the continuing interest of transferors whose compensation is largely dependent on future profitable use of the transferred rights with, on the other hand, the traditional notion that a seller divests himself of substantially all control over property sold. The difficulty lies in finding a legitimate place to draw the line between the reservation of sufficient rights and restrictions to protect one's continuing financial interest and the reservation of rights to continuing participation in the business on such a scale that it cannot properly be said that there was a sale. [United States v. Wernentin, 354 F.2d 757, 766 (8th Cir. 1965).]

In the present action the tax court determined that taxpayer failed to establish the requisite control necessary to transform the agreement from a sale to a license because neither "Toy or its successors exercised any significant control over Lakeside's manufacture and sale of Gumby toys." The court explained this conclusion by stating:

Although the demand for Gumby toys was largely created by the showing of the cartoons, Lakeside would have continued to have the right to promote and sell Gumby toys even if Productions refused to exhibit the films. More importantly, as between Lakeside and Productions Lakeside was clearly the dominant party because both legally and practically Lakeside could control the exhibition of the films.

This conclusion disregards the actual facts that in a commercial sense the showing of the film strips and the sale of the Gumby dolls were inseparable. Only the existence of Gumby film strips and the likelihood of their exhibition on television made the Gumby dolls a desirable product. The record shows Gumby as a toy could not be marketed successfully apart from the exhibition of the films. The film cartoons and their syndication were of no real value, apart from their exhibition as an adjunct to the sales of merchandise. By retaining ownership of the cartoon strips in Productions, the stockholders of Toy, most of whom held substantial interests in Productions, were assured of retaining substantial control over the marketing of the Gumby dolls. Additionally, the contract provisions recognized the interrelationship between television showing of the Gumby film strips and marketing of Gumby products by Lakeside, the transferee. Paragraph 3 of the agreement reads:

> Seller agrees that it will take all reasonable actions and proceedings and do all things reasonably requested by Lakeside to cause such actions and proceedings to be taken by Clokey Productions, Inc., in order to ensure that the cartoon series entitled "The Adventures of Gumby" is and will continue to be exhibited on television

decisions generally have been based on varying conditions in the transfer agreement and, when the agreement has been interpreted as *reserving significant powers, rights, or continuing interests to the transferor,* then it has been held that such reservations preclude a finding of a sale. [1969 U.S.Code Cong. and Admin.News 2241–2242, S.Rep.No. 91–552, 91st Cong., 1st Sess. (1969) (emphasis added).]

stations throughout the world and will make reasonable efforts to ensure the exhibition of said series on television stations designated by Lakeside.

Following execution of the contract, Productions may have cooperated with taxpayer in arranging for television exhibition of the film strips, but Productions never ceded control over the films to taxpayer.

■ We recognize that Productions retained ownership of the film strips, not Toy, the party contracting with the taxpayer. Yet the interrelationship between Toy and Productions requires that we consider Productions with Toy as the transferor in this case. Control of both corporations rested with the Clokeys. Toy served only as the vehicle to distribute Gumby dolls on a royalty-free license from Productions prior to the execution of the contract with taxpayer. Further, almost contemporaneous with the transfer of the rights to the Gumby trademarks, Toy dissolved and its stockholders agreed to share the income generated from the Toy-Lakeside contract among all the shareholders of Productions and Toy. Hence, we deem it appropriate to disregard the separateness of the corporations Toy and Productions and to treat them collectively as one owner holding all rights to effectively market Gumby dolls until these rights were partially transferred to taxpayer. For tax purposes, we must concern ourselves with actualities rather than the refinements of title; our concern is with the substance, not form. Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945); Griffiths v. Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319 (1939);

Coca-Cola Co. v. Commissioner, 369 F.2d 913 (8th Cir. 1966); Haag v. Commissioner, 334 F.2d 351 (8th Cir. 1964). We note, too, that the tax court in its analysis of the transaction considered Productions in a transferor posture.

We believe the opinion of Judge Blackmun v. United States v. Wernentin, *supra*, to be instructive. There we considered whether the transfer of Dairy Queen franchises which, among other things, called for the transferee to pay a specified lump sum fee upon the opening of Dairy Queen outlets in the "franchised" territory plus a gallonage charge, constituted a sale entitling transferor to capital gains treatment of the proceeds or a license requiring tax treatment of these proceeds as ordinary income. Noting the disagreements among the circuits in deciding similar cases, the *Wernentin* court found in accord with the Ninth Circuit,[5] contrary to the Fourth, Fifth, and Tenth Circuits,[6] that the lump sum payments did not qualify for capital gains treatment. With regard to the gallonage payments, we held these payments constituted ordinary income consistent with the tax treatment afforded payments under somewhat similar agreements considered by the Fourth and Ninth Circuits.[7]

In *Wernentin*, Judge Blackmun deemed it proper to take into consideration the actual relationship of the parties as well as the language of the parties:

We repeat what is already evident from what we have said above, that we do not decide the present case solely on the contracts. We have taken into consideration the activities of [the parties] * * *. We need not

5. Moberg v. Comm'r, 310 F.2d 782 (9th Cir. 1962) (finding a license).

6. Gowdey's Estate v. Comm'r, 307 F.2d 816 (4th Cir. 1962); Moberg v. Comm'r, 305 F.2d 800 (5th Cir. 1962); Dairy Queen of Oklahoma v. Comm'r, 250 F.2d 503 (10th Cir. 1957) (all finding a sale).

7. Gowdey's Estate v. Comm'r, *supra*; Moberg v. Comm'r, *supra* n. 5. Subsequent to our

opinion in United States v. Wernentin, 354 F.2d 757 (8th Cir. 1965), the Fifth Circuit similarly found in another *Dairy Queen* case that gallonage payments comprised ordinary income. Moberg v. Comm'r, 365 F.2d 337 (5th Cir. 1966). For a discussion of the Dairy Queen cases *see* The "Dairy Queen" Cases: A Suggested Approach to the Taxation of Franchise Sales, 34 U.Chi.L.Rev. 884 (1967); Comment, Federal Taxation of Franchise Sales, 44 Wash.L.Rev. 617 (1969).

speculate as to what our decision might be if the record before us contained only the cold contracts. Our record contains more than those agreements. It contains the warmth, the enthusiasm and the revealing activity of business enterprise and the continuous application in the market place of the parties' contractual arrangements. * * * We think that the present record presents, in actuality, under both the 1949 and 1951 contracts, something less than a sale. [354 F.2d at 766.]

Judge Blackmun also noted that the Ninth Circuit in its *Dairy Queen* case ruling, Moberg v. Commissioner, 310 F.2d 782 (9th Cir. 1962), had relied on its earlier decision in Schmitt v. Commissioner, 271 F.2d 301 (9th Cir. 1959). Appellant-taxpayer cites the *Schmitt* case as authority for its claim that the contract and the relationship between the transferor and transferee should be considered as one of license. We deem *Schmitt* apposite though it related to the transfer of a patent [8] rather than a trademark right.

Taxpayer in *Schmitt* had developed and patented an automatic mechanical process for accounting statements in which single-entry information was converted into double-entry records and accounting. During 1949, 1950, and 1951, Schmitt entered into 11 substantially similar agreements transferring to assignees certain rights in certain specified territorial areas for which he received certain lump sum payments. However, he retained the title to an indispensable adjunct to the accounting system—a certain wiring unit made by Remington-Rand to taxpayer's order. The Ninth Circuit held:

We concede the question may be close, but a careful examination of the evidence convinces us the Tax Court clearly had before it sufficient evidence of the retention of rights in the patented and copyrighted system, and of limitations imposed on the transferees, sufficient to establish that *less* than "all substantial rights" had been transferred. [271 F.2d at 307–308.]

The tax court found *Schmitt* inapplicable. We disagree.

■ We think the tax court gave inadequate consideration to the crucial elements of retention of title and actual control of the cartoon film strips in Productions. As we have already noted, were it not for the use of these cartoons, the rights to manufacture the Gumby dolls would be relatively worthless. Indeed, the two were inextricably bound—for Gumby the doll was unmarketable without Gumby the cartoon strip being aired on television. Moreover, the record demonstrates that the payment of unit fees on sales of Gumby dolls represented a price actually paid to the owners of the films for their active commercial participation in the operations relating to the marketing of the Gumby dolls.

Under the rationale of *Wernentin* and *Schmitt*, we must conclude from the record before us that continuing payments made by the "purchaser"-taxpayer based on sales of the various Gumby dolls represented a payment for an interest retained by the seller in the earnings of the Gumby dolls, through retainage of actual ownership of the film strips, rather than as part payment for rights transferred. *See also* Moberg v. Commissioner, 365 F.2d 337, 340 (5th Cir. 1966). Thus the taxpayer was entitled to deduct the payments made during

---

8. Congress has now provided for special consideration to transfers of patent rights, 26 U.S.C. § 1235. For a background explanation, see 1954 U.S.Code Cong. and Admin.News 5081–5084, S.Rep.No.1622, 83rd Cong., 2d Sess. (1954); 3B Merton's Law of Federal Taxation §§ 22.133, 22.134. The provisions liberalize the requirements for capital gains treatment of transfers of patents but do not apply to transfers of other types of property interests. Wernentin, *supra* 354 F.2d at 762. 26 U.S.C. § 1235 applied retroactively to Schmitt v. Commissioner, 271 F.2d 301, 303 nn. 4 & 5 (9th Cir. 1959); 26 U.S.C. § 117(q) (I.R.C.1939, as amended).

the tax years 1965 and 1968 (*see* n. 1, *supra*) as license fees for the right to manufacture and sell Gumby dolls.

Parenthetically, in denying taxpayer relief the tax court emphasized what it termed the unambiguous terms of the contract expressive of a sale rather than a license. The court noted in particular that the phrase "The Seller hereby sells, assigns and transfers to Lakeside [taxpayer's prior name] * * *" was inserted in the written agreement to satisfy the desires of the sellers who would not have signed the instrument without such language. True, if a taxpayer enters a written agreement fully appraised of its meaning and the tax consequences bargained for by the parties to the agreement, the taxpayer should not be relieved of the adverse tax consequences of his bargain. *See* Coca-Cola Co. v. Commissioner, *supra*; Annabelle Candy Co. v. Commissioner, 314 F.2d 1 (9th Cir. 1962).

However, this rule does not apply here for two reasons. First, the record, as we read it, does not establish that taxpayers ever agreed upon the tax treatment to be afforded either party to annual payments called for by the contract. The transferor insisted that the term "sale" be included in the contract but the parties agreed that each might report Gumby "royalties" as each saw fit. Second, in cases of this kind the nomenclature used becomes relatively unimportant because we must examine the contract as well as the entire relationship of the parties. Watson v. United States, 222 F.2d 689 (10th Cir. 1955); *Schmitt, supra* 271 F.2d at 305; *Wernentin, supra* 354 F.2d at 763. As we said in *Wernentin,* "nomenclature is not conclusive," and the case cannot be decided "solely on the contracts." 354 F.2d at 763, 766.

We hold that the transaction here examined in all its details constitutes a license to market the Gumby dolls, not a sale, although some words of sale may be found in the language of the contract. Accordingly, we reverse and remand this case to the tax court for further proceedings consistent with this opinion.

Reversed and remanded.

STUART, District Judge (dissenting).

I must respectfully dissent from the majority opinion. In my opinion the question here is basically one of fact and consequently appellate review must be quite restricted. The Tax Court's findings must stand unless clearly erroneous. Commissioner v. Duberstein (1960), 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218.

In this case the Tax Court found:

Both the representatives of Lakeside and those of Productions and Toy were aware of the difference in tax consequences between a sale of Toy's assets and a license to use them. The Clokeys were adamant that the Toy assets be sold so they could report their profit as long-term capital gain and would have refused to sign the agreement if they believed it to be a license. Lakeside's attorneys were primarily responsible for drafting the document which, after some revisions, became the final agreement between the parties. Toy's attorney, Harry L. Nelson, Jr., was in on reviewing and revising the drafts of the agreement, but was not experienced in tax matters. In the early stages of drafting the Lakeside attorney used a licensing agreement which Lakeside and another party had negotiated as a model for the agreement with Toy; however, in preparing the final draft Lakeside's attorneys included the language in paragraph 1, *supra,* 'The Seller, hereby sells, assigns and transfers to Lakeside,' as an accomodation [sic] to the desires of the Clokeys. Despite the accomodating [sic] language the Lakeside attorneys hoped that the final agreement embodied a license although they knew that the sellers held the opposite view. Appendix pp. 81–82.

In my opinion, these fact findings are not clearly erroneous.

It is, of course, the general rule that in the field of taxation the substance of the transaction as revealed by the evidence as a whole controls over the form employed. Haag v. Commissioner of Internal Revenue, 334 F.2d 351, 355 (8th Cir., 1964). Coca-Cola Company v. Commissioner (8th Cir., 1966), 369 F.2d 913, 917.

The Commissioner should not be bound by the form of the contract when the evidence discloses the transaction to be something other than that indicated by the contract language. However, I do not believe a party to a contract should be permitted to insert sales language in a contract, knowing the other party is insisting on a sale for tax purposes, and hope that the final agreement is actually a license, even though parties did not specifically agree how the transaction was to be treated for tax purposes.

Such concept places the Commissioner in a most difficult and impractical position. He would not be able to accept the express language of any contract but would in each instance be required to look behind the contract to determine its exact nature to prevent each party to the contract from treating it in the manner most favorable to it for tax purposes. I believe there is a sound distinction between a situation in which one of the parties to a contract seeks to establish a tax advantage by attempting to prove his contract is something other than it says it is and one in which the Commissioner seeks to go behind the wording of a contract to show what the transaction actually was. Parties should not be able to insulate themselves from just tax consequences by the form of the agreement. On the other hand the Commissioner should be able to rely on the form as expressing the true intent of the parties, and the parties should be estopped from contending otherwise. I do not believe the Commissioner should have the burden of looking behind every

agreement to determine the just tax consequences.

In my opinion Coca-Cola Company v. Commissioner (8th Cir., 1966), 369 F.2d 913 indicates the proper decision here. In that case the taxpayer agreed to purchase certain stockholdings for $350,000 from Scull, who also agreed to release his employer from the terms of an employment contract. On settlement date a second instrument was executed cancelling the employment contract. Neither instrument mentioned any monetary consideration for termination of the employment contract. For tax purposes, the taxpayer attempted to accrue as an expense $109,352.02 for the purchase of the employment contract. This court said:

Barbieri and his tax advisors immediately realized the tax implications of the agreement, but purposely avoided making any changes in the contract, apparently fearful that any change might cause the Scull group to back down from their previous agreement. 369 F.2d p. 915.

\* \* \* There is solid support for the inference drawn by the Tax Court that Barbieri and Johnson believed that if they amended the agreement to alter its tax consequences Scull might refuse to go through with the sale. It is plainly evident, as the Tax Court concluded, that Barbieri and Johnson, by failing to voice any objections, acquiesced in the obvious tax implications of the agreement and thus adopted, as their own, Eskin's intent in drafting the agreement. In other words, as the Tax Court stated, "the contemplated tax results were part of the bargain."

As thus posited, we are not favorably impressed with the plea that a court should rewrite the contract and relieve the taxpayer of the plight, taxwise, in which it finds itself, a dilemma which in our view is the creation of its own deliberate judgment. 369 F.2d p. 917.

* * * Certainly the courts are at liberty to pierce the form of a particular transaction to arrive at the just tax liability. This Court, however, is not prone to encourage a taxpayer who enters into a written contract fully apprised of its meaning and effect from a tax standpoint to seek escape therefrom on the theory that it does not represent the actual agreement. 369 F.2d p. 918.

The Tax Court there, as here, went on to find the contract stated the actual agreement. Although I feel this should not be necessary under these circumstances because of the deliberate use of sales language and the limited scope of review, I also agree that this transaction constituted a sale rather than a license.

The Tax Court determined the taxpayer failed to establish the requisite control necessary to transform the agreement from a sale to a license. The contractual provisions are as consistent with preservation of security interests (as they were denominated in the contract) as with licensing controls.

The majority believes that retention of ownership of the cartoon strips in Productions assured Toy of substantial control over the marketing of Gumby dolls. I do not believe this is a realistic evaluation of the situation. True, the successful promotion of Gumby toys was tied to the showing of the cartoons, but Lakeside was the only customer for the cartoons. Productions could profit from the cartoons only if Lakeside were willing to purchase the barter time Produc-

tion received as payment from television stations. An express provision in the contract required Productions to make reasonable efforts to ensure the exhibition of Gumby cartoons on television stations designated by Lakeside. Cooperation was necessary for either to profit. Productions could gain nothing by refusing to show cartoons over stations Lakeside designated. I believe Lakeside rather than Productions had the practical domination over the situation.

In the cases cited by the majority for the general proposition that we must concern ourselves with substance not form, Commissioner v. Court Holding Co. (1945), 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Griffiths v. Commissioner (1939), 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; and Haag v. Commissioner (8th Cir., 1964), 334 F.2d 351, were situations where the Commissioner was attacking the form and seeking to get to the substance. In Coca-Cola v. Commissioner (8th Cir., 1966), 369 F.2d 913, this court frowned upon the attempt of the taxpayer to urge the agreement was other than stated and held the form stated the actual agreement.

Under my view of the case, it becomes necessary to decide the question of depreciation. In my opinion there was no evidence to support the Tax Court's determination that the taxpayer failed to show a reasonable approximation of the useful life of the Gumby doll. The result which would then follow does not vary substantially from that reached by the majority opinion.