James R. Parks and Dorothy Parks v. Commissioner.
Parks v. Commissioner
Docket No. 4417-64.
United States Tax Court
T.C. Memo 1967-16; 1967 Tax Ct. Memo LEXIS 248; 26 T.C.M. (CCH) 104; T.C.M. (RIA) 67016; January 30, 1967
Eldred Dede, for the petitioners. Denis J. Conlon, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined a deficiency in income tax and addition to tax under section 6654 *249 [1] for the calendar year 1959 in the amounts of $31,032.55 and $97.79, respectively. The only issue remaining for decision is whether petitioners constructively received ordinary income as liquidated damages from the expiration of an option granted by petitioner James R. Parks. Findings of Fact Some of the facts are stipulated and are found accordingly. James R. Parks and Dorothy Parks, husband and wife, residing in Milwaukee, Wisconsin, filed their tax return for 1959 with the district director of internal revenue, Milwaukee, Wisconsin. Dorothy, now divorced from James, is a party to this proceeding only by reason of having filed a joint return with him. Accordingly, "petitioner" will be used to refer to James. In 1949, Parks Engineering, Inc. (hereinafter referred to as "Parks, Inc. 1949") was formed as a Wisconsin corporation. Petitioner was vice president of the corporation from 1949 to 1953 and president from 1953 to May 31, 1957. Parks, Inc. 1949 manufactured connecting rods by a method patented under Patent No. *250 2,553,935 dated May 22, 1951. All of the issued and outstanding shares were owned by Dorothy. The patent was owned by Nellie A. Boucha, the mother of Dorothy, and licensed to Parks, Inc. 1949 under an agreement dated November 15, 1954. Shortly prior to May 31, 1957, petitioner purchased all of the rights, title, and interest in the patent, subject to the Parks, Inc. 1949 license, which license was scheduled to expire on December 31, 1958. On May 31, 1957, Parks, Inc. 1949 entered into a contract for the sale of substantially all its property to the C.E.L. Corporation, controlled by Charles E. Letts, Sr. and Charles E. Letts, Jr. Under the formula by which the price was computed, the contract called for the payment of $100,000 for certain machinery and equipment having an approximate $30,000 book value as of April 30, 1957, $43,000 for assignment of the patent license agreement (having a zero book value), and the net book value as of May 31, 1957 for the other assets covered by the contract, including inventory, automotive equipment, office machinery, and machinery and equipment acquired by seller after May 1, 1956. Seller further agreed to assign a lease to the premises occupied *251 by it. The transaction was closed on May 31, 1957 and $195,254.75 was paid for the assets. The "net gross sales" and the profits after taxes of Parks, Inc. 1949 for 1954 through April 1957 were as follows: "Net gross
Profit after
Period
sales"
taxes
1954
$267,399.27
$26,251.13
1955
414,330.57
39,529.57
1956
499,339.43
44,898.63
January through
April 1957
198,283.02
23,095.98
Also on May 31, 1957, certain related agreements were executed as indicated in the sale contract. In one of the agreements, C.E.L. Corporation agreed to employ petitioner as general manager for a period of five years at a salary of $25,000 per year plus one-half percent of "net gross sales" of the business. Petitioner further agreed not to compete with C.E.L. for a period of 10 years from the date of execution of the agreement. In a second agreement, petitioner gave C.E.L. Corporation an option to purchase his interest in the patent. The option expired on the same day as the license agreement expired, namely, December 31, 1958. Upon exercise of the option, optionee agreed to pay, for the duration of the patent and any extensions thereof, in quarter-annual installments, *252 the sum of which in each year would be the greater of the following: (a) $15,000; or (b) Fifteen percent (15%) of Optionee's gross profit as * * * defined for the year, provided, however, that when optionor shall have received an amount equal to $150,000.00 under the formula set forth in this Paragraph * * * then optionor shall thereafter be entitled only to fifteen percent (15%) of optionee's said gross profit with no minimum guarantee. In the event C.E.L. should fail to exercise the option, it agreed to pay petitioner $50,000 as liquidated damages on or before December 31, 1958. Charles E. Letts, Sr. agreed to guarantee the payment of either the liquidated damages or the first $150,000. Shortly after the signing of the agreements, Parks, Inc. 1949 changed its name to J. & D. Corporation. At the same time, C.E.L. Corporation changed its name to Parks Engineering, Inc. (hereinafter referred to as "Parks, Inc. 1957"). Subsequently the cash obtained in the sale and the retained assets, principally notes receivable and cash, were distributed to Dorothy by J. & D. Corporation in a liquidation purportedly qualifying under section 337 in exchange for all her shares. During the *253 period of its existence, Parks, Inc. 1957 manufactured connecting rods under the patent in the same manner as the predecessor corporation and was managed by James R. Parks in accordance with the employment agreement. On December 17, 1958, Parks, Inc. 1957 and various other corporations owned or controlled by Charles E. Letts, Sr., of Detroit, Michigan, were merged to form Letts Industries, Inc. The business conducted by Parks, Inc. 1957 was thereafter known as the Parks Engineering Division of Letts Industries, Inc. Petitioner was unhappy with the consolidation. At the same time, he was also disturbed because the Letts group was seeking to redraft the option agreement to remove the personal guarantee of Charles E. Letts, Sr. The years 1957 and 1958 had been relatively unprofitable years in the twocycle gasoline engine business and the Parks, Inc. 1957 profits after taxes had slipped to an annual rate of $25,000. On December 29, 1958, petitioner and Parks, Inc. 1957 [2] agreed to a written temporary extension of the option agreement and the license agreement to January 31, 1959. *254 Early in January 1959, petitioner and the Letts group began discussing a resale of the business to petitioner. By a letter dated January 23, 1959, counsel for Letts, Industries, Inc., the successor to Parks, Inc. 1957, advised petitioner that the optionee did not intend to exercise the option to purchase the patent. In March 1959, a new Wisconsin corporation, Parks Engineering, Inc. (hereinafter referred to as "Parks, Inc. 1959") was organized. James R. Parks was the president. The stockholders were James R. Parks and Dorothy Parks, each owning 15,000 shares of common stock. On May 4, 1959, Letts Industries, Inc. and Parks, Inc. 1959 entered into an agreement covering the purchase by Parks, Inc. 1959 of all the assets of the Parks Engineering Division of Letts Industries, Inc. The agreement provided for a net purchase price of $147,783.82, computed by substracting certain adjustments from the value of the assets as shown on the February 28, 1959 balance sheet of Parks Engineering Division. The balance sheet of the Parks Engineering Division showed the following: Current Assets
Petty Cash
$ 100.00
First Wis. Nat'l Bank,
Ck. a/c
33,802.37
Accounts Receivable
46,845.41
Inventory - Materials
6,581.38
Inventory - Work in Proc-
ess
27,190.30
Total Current Assets
$114,519.66
Fixed Assets (before depreciation
reserves)
Auto Equipment
$ 8,506.75
Machinery & Equipment
106,855.47
Office Equipment
6,531.88
Total Fixed Assets
121,894.10
Other Assets
3,128.29
TOTAL ASSETS
$239,542.05
*255 The following adjustments [3] were set forth in the contract: (a) Total liabilities Buyer
assumes and agrees to
pay as set forth in
Paragraph (1) hereof
$20,412.39
(b) Reserves for all depre-
ciation (except 1/2 of
the reserve for depre-
ciation on machinery
and equipment) as of
February 28, 1959
21,254.14
(c) Adjustment for pre-
paid rental on park-
ing lot and building
91.70
(d) [Unidentified]
50,000.00
Total Adjustments
$ 91,758.23
Net Purchase Price
$147,783.82
The depreciation reserves aggregated $39,556.39, of which $36,604.49 represented depreciation on machinery and equipment. The May 4, 1959 agreement provided for the release of petitioner from the employment agreement (including the covenant not to compete), the reassignment of the lease on the business premises, and the release of Letts Industries, Inc. from its obligations *256 under the 1957 option agreement. These provisions were implemented and, in addition, a mutual general release was executed by petitioner and Letts Industries, Inc. The books of Parks, Inc. 1959 reflected the $50,000 adjustment by reducing the book values of the fixed assets from the values initially assigned in the contracts. Thus, machinery and equipment was entered at $44,276.67, automotive equipment at $3,381.50, and office furniture at $2,981.79. An entry on the books of Letts Industries, Inc. characterized the $50,000 adjustment as being in satisfaction of the liquidated damages provision of the option agreement. Respondent determined that the $50,000 credit represented a constructive payment to petitioner of the liquidated damages due under the option agreement if the option was not exercised, which petitioner had not reported on his 1959 return, and, accordingly, increased petitioner's ordinary income by $50,000. Ultimate Finding of Fact The $50,000 credit on the purchase price was a constructive payment to petitioner in satisfaction of the $50,000 liquidated damages provided for in the option. Opinion In this case, we are called upon to do something which the *257 parties to a contract failed to do - namely, identify a $50,000 adjustment to the purchase price of certain assets. As our findings of fact show, the 1959 contract, whereby petitioner, through the vehicle of a corporation wholly owned by himself and his wife, repurchased assets which had been sold in 1957 by a corporation wholly owned by his wife, established the purchase price as $239,542.05, less the following adjustments: (a) Total liabilities Buyer
assumes and agrees to
pay as set forth in
Paragraph (1) hereof
$20,412.39
(b) Reserves for all depre-
ciation (except 1/2 of
the reserve for depre-
ciation on machinery
and equipment) as of
February 28, 1959
21,254.14
(c) Adjustment for pre-
paid rental on park-
ing lot and buildings
91.70
(d) [Unidentified]
50,000.00
Total Adjustments
91,758.23
Net Purchase Price
$147,783.82
Petitioner insists that the $50,000 represents nothing more than a downward adjustment in the purchase price which he succeeded in obtaining at the last minute in the negotiations and which, according to him, reflected the fact that the book value of the assets, even taking into account the full amount of the seller's *258 depreciation, was overstated. Respondent, on the other hand, maintains that the $50,000 represents the realization by petitioner, through an offset to the purchase price, on an amount to which petitioner would have otherwise been entitled as liquidated damages for the failure of the seller to exercise an option to acquire a patent which petitioner granted to it at the time of the 1957 transaction. [4]
The inherent difficulty in resolving the problem with which we are confronted stems from the state of the record before us, which mirrors several gaps and unexplained inconsistencies. Thus, petitioner testified that the excess of the price paid for the assets over their book value in 1957 represents the earning potential of the business. Yet, the fact of the matter is that such excess was otherwise allocated in the 1957 documents. Seventy thousand dollars was attributed to the alleged difference between fair market value and book value of the machinery and equipment. Petitioner testified that he had an appraisal made which showed no such excess and *259 an officer of the purchaser testified as to an appraisal made for it which confirmed such excess. Neither of these appraisals was furnished to us. Forty-three thousand dollars was allocated to a license agreement which had only 19 months to run, but it had no book value and we were not favored with any testimony indicating the basis of such allocation. We note that this $43,000 is in addition to the royalty payable under the license. None of the witnesses, including petitioner, suggested that the $50,000 liquidated damages for the nonexercise of the option to acquire the patent was otherwise than what it purported to be, but no explanation was advanced as to the reason for this unusual provision or on what basis it was determined that liquidated damages should be in such amount. In short, it seems clear that, for reasons which are obvious and which were designed to facilitate the handling of the transaction from the point of view of the purchaser without damaging any interests of the seller, the allocations at the time of the 1957 transactions may not have reflected the true relationship of the purchase price to the various elements of the business. With respect to the 1959 transaction, *260 similar gaps and inconsistencies exist. Petitioner testified that he released the obligation of the seller to pay the $50,000 in exchange for freedom from his covenant not to compete, stating that it would otherwise have been meaningless for him to buy back the business. He conveniently ignores the provision in the employment agreement which specifically stated that, in the event of the sale of the business, the covenant not to compete was to terminate. Petitioner further testified generally that, at the time of the 1959 transaction, the earning potential of the business had disappeared. In point of fact, however, the evidence in support of this testimony went no further than the bare assertion that the earnings of the business had slipped to an annual rate of $25,000 after taxes as compared with $26,000 in 1954, $39,500 in 1955, $45,000 in 1956, and $23,000 for the first four months of 1957. [5] Further, details as to the success or failure of business operations after May 1, 1957 were not submitted to us. Nor were we favored with any evidence which would support petitioner's assertion that there was no reason for him to pay for attributes, such as the name or customer relationships, *261 which allegedly attached to him personally. On the contrary, petitioner himself testified that he wanted to continue to use the name Parks Engineering, Inc. after the 1959 transaction "to preserve the continuity of the name and the relationship with the customers." When we come to the question of the value of the physical assets themselves in 1959, we are, of course, not bound by the values placed on these assets in the 1957 contract. But such values were arrived at in an arm's-length transaction and, as we have already pointed out, we were given little probative evidence to confirm our contrary suspicions in this regard. Petitioner's case rests principally on the basis upon *262 which he allegedly wrote down the 1959 value of the physical assets. The following table indicates the appropriate values assigned by the contract for these three groups of assets before allowing for the $50,000 credit and the values assigned by petitioner: Contract
Petitioner's
Values
Figures
Machinery and equipment
$88,553.23
$44,276.67
Automotive equipment
6,123.15
3,381.50
Office furniture
5,963.58
2,981.79
Petitioner justifies the reduction in the value of the automotive equipment by claiming that he took his figures from the socalled Blue Book, but the Blue Book was not offered in evidence and petitioner failed to describe the automotive equipment with sufficient particularity for us even to attempt to estimate its true value. Petitioner justifies the reduction in the value of the office furniture by saying that his auditor "felt" that the reduction was necessary, but the auditor did not testify and no other basis for evaluating petitioner's figure was furnished. Shortly before the signing of the 1959 contract, petitioner obtained an appraisal of the machinery and equipment which indicated an approximate value of $57,310 based on the equipment *263 set up and wired in its present location as a complete unit. The appraisal went on to indicate that, if the equipment was to be sold on an individual basis and removed from its present location, it would bring 20-25 percent less. Petitioner's $44,276.67 figure is 22.76 percent less than the appraisal value of $57,310. In other words, according to petitioner's own appraisal, his figures are only accurate on the assumption that Parks, Inc., 1959 would have to be liquidated - an assumption completely at variance with the actual facts. The structure of the 1959 agreement also militates against the petitioner's position. It seems incongruous, to say the least, that the seller would have in one paragraph refused to credit the purchase with the full depreciation reserve, indicating that the seller thought the assets were worth more than book value, and two paragraphs later grant a reduction in the purchase price based on the premise that the assets were worth less than book value. Nor are we unmindful of the fact that the parties had the benefit of legal counsel, both of whom were available as witnesses but were deliberately not called. [6] Similarly it is a curious coincidence, to say the *264 least, that the amount of the credit equals the precise amount payable in the event the option was not exercised. Likewise, although it is of course not binding on the petitioner or us, we cannot completely ignore the fact that the seller treated the $50,000 on its books as payment of its obligation under the option agreement. Finally, petitioner seeks to avoid the entire problem by asserting that at no time did he have any right to the $50,000 and therefore he cannot be held to have received it. The nub of his argument is that the January 23, 1959 letter from the seller's attorney notifying him that the option would not be exercised was nullified by subsequent oral extensions, that the option agreement was at all times executory, and that he thus released no more than an inchoate right to payment at the time of the May 1959 transaction. We see no need to delve into the intricacies of whether or when *265 petitioner's right to payment became fixed. Granted that the option agreement did not specifically deal with the situation if the business was reacquired prior to the exercise of the option, we are satisfied that the seller was contractually obligated to pay petitioner $50,000, even under such circumstances, and that it was released of this obligation in May of 1959. We are not impressed by petitioner's suggestion that at most he obtained a bargain purchase in 1959 and that a bargain purchase does not give rise to income provided the transaction is at arm's-length. Concededly, the Letts group dealt with petitioner at arm's-length. But petitioner's suggestion misses the point. Two transactions are involved, not just one. A taxpayer can not normally escape income on one transaction merely by combining it with a second transaction. Such postponement of tax is available only in limited situations, of which this is not one. See, e.g., sections 1033 and 1034, Haag v. Commissioner, 334 F. 2d 351 (C.A. 8, 1964), affirming 40 T.C. 488 (1963), relied on by petitioner, is inapposite. Perhaps if we could rewrite the 1957 and 1959 agreements, we could agree with petitioner *266 and permit him to extricate himself from the trap in which he appears to have been caught. But, on the record herein, we have no alternative but to conclude that the $50,000 unidentified credit in the May 4, 1959 agreement represented the amount which the seller was obligated to pay petitioner for failure to exercise the option to acquire petitioner's patent, that it was constructively paid to him and contributed by him to the capital of his wholly-owned corporation so that it could be utilized by the corporation to satisfy its obligation to pay for the assets which it was then acquiring. On brief, petitioner did not contest the increase of $210 in his income for 1959 representing the purchase price of a certain television set paid by Parks, Inc. 1959, and prior to trial he conceded the other adjustments made by respondent. Decision will be entered for the respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954. The addition to tax is unrelated to the issue herein and is not contested by petitioners.↩
2. Though technically Parks, Inc. 1957 had been merged into Letts Industries, Inc., it apparently continued to be referred to as Parks, Inc. 1957.↩
3. The contract also provided for an adjustment to the purchase price to reflect any inventory and equipment purchased and paid for by the seller prior to February 28, 1959 but not delivered by that day. Buyer further agreed to assume liability for inventory and equipment on order as of February 28, 1959.↩
4. Petitioner has not contested the characterization of the $50,000 as ordinary income if we find that he is taxable on that amount.↩
5. The record indicates that earnings were not evenly distributed over the year so that we cannot conclude that the 1957 earnings exceeded $65,000. We also note that the reduction in earnings may have been attributable in part to the fact that petitioner received a basic $25,000 annual salary plus 1/2 percent of "net gross sales" after the 1957 transaction as compared with total compensation of substantially less than half that amount during 1956, as indicated by the income statements of Parks, Inc. 1949.↩
6. The record shows that Harold Lichtsinn, petitioner's attorney, was in the courtroom at the time of trial but that petitioner chose not to call him and that Jerry Luptak, seller's attorney, was under subpoena and would have testified in rebuttal if Lichtsinn had been called.↩