The COCA–COLA COMPANY, a Corporation, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 18395.

United States Court of Appeals Eighth Circuit.

Dec. 15, 1966.

Donald H. Erickson, of Swenson, Erickson & Nelson, Omaha, Neb., for petitioner. Deryl F. Hamann, of Young, Holm, McEachen & Hamann, Omaha, Neb., was with him on the brief.

Marco S. Sonnenschein, Atty., Tax Division, Dept. of Justice, Washington, D. C., for respondent. Mitchell Rogovin, Asst. Atty. Gen., Tax Division, Dept. of Justice, Washington, D. C., Meyer Rothwacks and Gilbert E. Andrews, Attys., Tax Division, Dept. of Justice, Washington, D. C., were with him on the brief.

Before MATTHES and LAY, Circuit Judges, and HARPER, District Judge.

MATTHES, Circuit Judge.

This tax case is before us on petition to review the decision of the Tax Court, not officially reported.[1]

The question in controversy is whether Penndale, Inc. was entitled to accrue as year ending February 29, 1960, the sum of $109,352.02 for termination of the employment contract of one William S. Scull, II, and to deduct that expense under § 162(a) in computing its income taxes for that fiscal year.[2]

The Tax Court viewed the controversy as presenting basically a fact question and found that no part of the amount paid to Scull constituted consideration for termination of his employment contract.

Penndale, Inc., hereinafter referred to as Penndale or taxpayer, was incorporated in New Jersey in 1951 under the name Jet, Inc.[3] On February 28, 1951, William S. Scull, II, president of Penndale and one of its substantial stockholders, entered into the contract of employment which plays an important part in this lawsuit. In pertinent part the contract provided:

"1. Company agrees to employ Scull and Scull agrees to devote his full time, energy and attention to the work of the company in such capacity as the Board of Directors and the company shall designate.

2. As compensation for his services, Scull shall receive from the company a salary at the rate of Twenty Thousand Dollars ($20,000.00) per year, and in addition thereto shall receive amounts equal to the following:

10% of the net proceeds of the company from $50,000 to $100,-000.00.

15% of the next [sic] proceeds of the company from $100,000.00 to $200,000.00.

5% of the net proceeds of the company in excess of $200,000.00; provided that in no event shall Scull's aggregate compensation, including both salary and participation in proceeds, exceed the sum of $100,000.00 in any one year."

In addition, the duration of Scull's employment contract was for a period of ten years, effective from April 1, 1951.

During 1956 Penndale entered into a large contract to supply instant coffee to Paxton & Gallagher, a Nebraska corporation. Execution of this contract required an extensive plant expansion. Penndale borrowed extensively from Paxton & Gallagher and from the Donner Foundation, Penndale's major stockholder, to finance this expansion. Despite the contract Penndale nevertheless experienced financial problems and production lags as the result of antiquated equipment and managerial difficulties, most of which were attributed by his critics to Scull, who was then still president of Penndale. Mr. Maes, at that time the head of the Donner Foundation, desired the removal of Scull from Penndale's top position, but was informed by counsel that Scull's employment contract was a valid obligation of Penndale.

1. In the Tax Court, taxpayer was designated as Butter-Nut Foods Co., one of the successors in interest to Penndale, Inc. Petitioner on this appeal, the Coca-Cola Co., is the successor to Butter-Nut Foods Co.

2. The deduction of this expense by taxpayer on its income tax return for the fiscal year ending February 29, 1960 resulted in a loss carryback to its fiscal year ending February 28, 1959. The Commissioner thereupon assessed a deficiency in the amount of $31,793.08 for the fiscal year of Penndale ending February 28, 1959, and a deficiency in the amount of $19,452.55 for Penndale's fiscal year ending February 29, 1960, based upon a disallowance of this deduction.

3. On March 12, 1952 the corporate name was changed to Penndale, Inc. On May 1, 1961 Penndale was merged into Paxton & Gallagher Co., a Delaware Corporation (the successor to Paxton & Gallagher Co., a Nebraska Corporation). On May 19, 1961 the name of Paxton & Gallagher Co. was changed to Butter-Nut Foods Company, the petitioner in the Tax Court.

In January of 1959, the assets of Paxton & Gallagher Co. were sold to a new Delaware corporation of the same name which assumed all the assets and liabilities of the Nebraska corporation, including its 1956 contract with Penndale. The principal stockholders in this new corporation were W. Clarke Swanson and Associates, known as the Omaha group. On February 25, 1959, W. Clarke Swanson and Associates contracted with the Donner Foundation to purchase its majority interest in Penndale for $10.0808 per share and $1.00 per option and to assume Penndale's outstanding indebtedness to the Donner Foundation. By May 31, 1959 Penndale's stock ownership had substantially changed so as to give Paxton & Gallagher majority control over 63.5% of Penndale's stock, leaving the minority shareholder with 36.5% ownership of the company.

Subsequently Paxton & Gallagher offered to purchase the stock of the minority shareholders on the same basis as the Donner purchase, namely, $10.0808 per share and $1.00 for the options. The minority, who in the aggregate became known as the Scull group, authorized Bernard Eskin, attorney for Scull, to act on their behalf in dealing with Paxton & Gallagher.

On March 24, 1959 Penndale relieved Scull of his duties as president of Penndale and retired him from the day to day operations of the company, but continued to honor his employment contract. Scull at this time had actively interested himself in other coffee processing ventures outside Penndale and was fearful that such activity might be considered a breach of his employment contract as an appropriation of a corporate opportunity. With the assistance of his attorney, Eskin, he wrote a letter exposing these potential corporate opportunities to the taxpayer and expressed his willingness to comply with the terms of his employment contract. Taxpayer subsequently disavowed any interest in these ventures. During the month of May, 1959, Mr. Barbieri, acting as attorney for Paxton & Gallagher, renewed his client's offer

of March 19, 1959 to purchase the stock and options of the Scull group at $10.0808 and $1.00, respectively. As before, Eskin rejected this offer and requested a price of $15.00 per share. Barbieri, however, was instructed to adhere to a price of $10.0808 per share of stock and $1.00 per option during negotiations and thus the parties reached no agreement at this time. Contemporaneously with their discussions concerning Penndale's stock and options Barbieri and Eskin also negotiated regarding certain patents and debt obligations of the taxpayer, Scull's employment contract, and a restrictive covenant limiting Scull's future activities in the coffee industry, which was later rejected. Negotiations continued, but no agreement was reached as to any specific amount for the employment contract. Scull, on the other hand, testified that he instructed Eskin to attempt to secure a release from the obligations of his employment contract because of his interests in other ventures. Since neither Barbieri nor Eskin could agree to any specific allocation for any of the items involved, negotiations towards the end were conducted in terms of a gross price to be paid. Finally, a bargain was struck for a lump sum figure of $350,000.

Eskin, on July 3, 1959, prepared a draft of the agreement reflecting the sale of the Scull group's interests in Penndale, and forwarded it to Barbieri. Barbieri and his tax advisors immediately realized the tax implications of the agreement, but purposely avoided making any changes in the contract, apparently fearful that any change might cause the Scull group to back down from their previous agreement. Cecil A. Johnson, general counsel and tax and business advisor to Paxton & Gallagher and W. Clarke Swanson and Associates, advised Barbieri that the substance of the transaction would prevail over its form. Scull, on behalf of the Scull group, executed the agreement on July 14, 1959. The agreement in pertinent part provided:

"1. Seller agrees to sell and deliver to Buyer and Buyer agrees to purchase the following securities of Penndale,

Inc., presently issued and outstanding in the names of the individuals and in the amounts as indicated:

[the respective stock holdings of the Scull group were then listed without reference to the employment contract].

"2. As the purchase price for the foregoing securities Buyer agrees to pay to Seller the sum of $350,000 in cash at settlement, as hereinafter provided.

\* \* \* \* \* \*

"■ (c) Seller shall deliver to Buyer instrument executed by Seller acknowledging that Penndale Inc. has no further obligations to Seller under a certain agreement dated February 28, 1951, that said contract is cancelled and the employment thereunder is terminated as of the date of settlement, and generally releasing Penndale Inc.

"(d) Buyer shall deliver to Seller instrument executed by Penndale Inc. acknowledging that Seller has no further obligation to Penndale Inc. under the said agreement dated February 28, 1951, that the said agreement is cancelled and Seller's employment thereunder is terminated as of the date of settlement, and generally releasing Seller from any and all obligations of any nature to Penndale, Inc."

Pursuant to the agreement of July 14, 1959 settlement took place at 10:00 A.M. on July 17, 1959, at which time Paxton & Gallagher remitted the unpaid balance of $325,000 due under the agreement. Scull then resigned as an officer of taxpayer, and the securities evidencing the interest of the Scull group were turned over to Paxton & Gallagher. As part of this settlement taxpayer and Scull executed a second agreement terminating the latter's employment contract, which, after a recital of the preliminaries, provided in pertinent part:

"\* \* \* The parties now desire to sever their relationship, to terminate the employment under the said contract and to exchange mutual releases.

NOW THEREFORE, the parties hereto in consideration of the mutual promises herein contained and intending to be legally bound, agree as follows:

1. The contract of employment dated February 28, 1951, between the parties is hereby cancelled and terminated as of the date hereof.

2. Penndale acknowledges that as of the date hereof it has no claims of any nature against Scull and Penndale hereby releases Scull from any and all obligations of any nature which may exist.

3. Scull acknowledges that as of the date hereof he has no claims of any nature against Penndale and Scull hereby releases Penndale from any and all obligations of any nature which may exist."

Following the consummation of these various agreements, Eskin allocated payment of $25,000 for attorney fees and debt obligations, and apportioned the remaining $325,000 among the members of the Scull group in proportion to their holdings of common stock and options. His calculations did not allocate any amount for termination of the employment contract between Scull and taxpayer. On the afternoon of July 17, 1959, the Board of Directors of Penndale by resolution formally approved the purchase of Scull's employment contract, which was accrued as an expense on its books in the amount of $109,352.02.[4]

Neither Penndale nor Paxton & Gallagher submitted an Information Return (Form 1099) to Scull advising him that part of the consideration paid under the agreement of July 14, 1959 was being treated as payment for his employment

4. The figure of $109,352.02 was computed by Penndale as the balance of the $350,-000 purchase price after allocation of $10.0808 for the purchase of each share of stock and $1.00 for each option, plus $14,280 for assumption of all outstanding indebtedness of Penndale.

contract. Scull subsequently filed his income tax return for 1959 and treated all of his proceeds as capital gain from the sale of stock.[5]

Taxpayer challenges the finding of the Tax Court that no part of the $350,000 paid by Paxton & Gallagher constituted consideration for the cancellation of Scull's contract of employment. In short, taxpayer's position necessarily is that the Tax Court's finding on this crucial issue is clearly erroneous. We disagree.

At the outset we believe that on this record there is justification for affirming on the basis of the written contract for the sale of the securities. The circumstances antedating and surrounding the execution of that contract are indeed significant. It was understood that Eskin was representing and negotiating for *all* of the minority stockholders, not just Scull, who alone was interested in the employment contract. Barbieri, representing the purchaser, believed the contract had tax implications and for that reason submitted it to Johnson, a tax specialist. The latter manifestly entertained the same feeling but instead of insisting on the contract being changed, merely suggested that substance would prevail over form. It is quite evident that Johnson and Barbieri recommended that the contract, in the form drafted by Eskin, be executed by the purchaser.

The contract is clear and unambiguous.[6] By its terms the minority group of stockholders agreed to sell and the taxpayer agreed to purchase the securities for $350,000. Provision was made for cancellation of the employment contract. On July 17, 1959, the date of the consummation of the sale, the parties executed a second document in the nature of a mutual release of all obligations existing under the employment contract.

There is solid support for the inference drawn by the Tax Court that Barbieri and Johnson believed that if they amended the agreement to alter its tax consequences Scull might refuse to go through with the sale. It is plainly evident, as the Tax Court concluded, that Barbieri and Johnson, by failing to voice any objections, acquiesced in the obvious tax implications of the agreement and thus adopted, as their own, Eskin's intent in drafting the agreement.[7] In other words, as the Tax Court stated, "the contemplated tax results were part of the bargain."

As thus posited, we are not favorably impressed with the plea that a court should rewrite the contract and relieve the taxpayer of the plight, taxwise, in which it finds itself, a dilemma which in our view is the creation of its own deliberate judgment.

■ Taxpayer seeks to circumvent the written contract by arguing that it does not in fact represent the actual agreement of the parties, and that consideration of the prior negotiations between the parties requires the conclusion that a portion of the amount paid was for cancellation of the employment contract.[8] It is, of course, the general rule that in the field of taxation the substance of the transaction as revealed by the evidence as a whole controls over the form employed. Haag v. Commissioner of Internal Revenue, 334 F.2d 351, 355 (8th Cir. 1964) and cases cited therein. Cer-

---

5. The proper tax treatment of Scull's income was also an issue in prior litigation. William S. Scull, II, CCH Tax Ct. Mem. 1964–224 (1964). In the Scull case the Commissioner took the position, inconsistent with that taken here, that part of Scull's income was allocable to cancellation of the employment contract. The Tax Court found as a fact that none of the $350,000 purchase price was allocable to the employment contract and allowed Scull capital gains treatment on the entire amount received by him.

6. There is no suggestion that the contract was tainted by fraud, mutual mistake or overreaching by Scull.

7. Eskin testified (a) that he considered the tax consequences, and (b) that in distributing the $350,000 the employment contract was given no consideration.

8. The Tax Court did not decide whether the value of the employment contract was $109,352.02, the amount allocated thereto by taxpayer after the transaction had been consummated.

tainly the courts are at liberty to pierce the form of a particular transaction to arrive at the just tax liability. This Court, however, is not prone to encourage a taxpayer who enters into a written contract fully apprised of its meaning and effect from a tax standpoint to seek escape therefrom on the theory that it does not represent the actual agreement.

We find the factual situation in Hamlin's Trust v. Commissioner of Internal Revenue, 209 F.2d 761 (10th Cir. 1954) convincingly analogous to that presented here. In ruling against the taxpayer's contention that the written agreement did not represent the actual agreement, the Court stated:

" * * * the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it. * * * It is reasonably clear that the sellers failed to give consideration to the tax consequences of the provision, but where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences. While acting at arm's length and understandingly, the taxpayers agreed without condition or qualification that the money received should be on the basis of $150 per share for the stock and $50 per share for the agreement not to compete. Having thus agreed, the taxpayers are not at liberty to say that such was not the substance and reality of the transaction." (Citing cases). 209 F.2d at 765.

The Tax Court, being familiar with the substance over form principle held a plenary trial and went behind the written agreement for the purpose of determining whether it reflected the substance of the transaction. We have canvassed the whole record and are satisfied that there is ample support for the Tax Court's finding that the written agreement embodied what the parties had agreed upon. The following circumstances lend weight to this conclusion.

1. Paxton & Gallagher twice offered to pay the Scull group $10.0808 per share and $1.00 for each option right, but the Scull group steadfastly demanded $15.00 per share.

2. After Barbieri's request that Scull enter into a covenant not to compete was rejected, all negotiations were conducted on a lump sum basis. Eskin's suggestion of $350,000 was accepted, but nothing was said about allocating any part of that amount to the employment contract. In Eskin's covering letter of July 3, 1959, he stated:

"I enclose original and three copies of a draft agreement for the sale of the Penndale securities by Mr. Scull and the other minority stockholders * * *."

The employment contract was not mentioned.

3. Paxton & Gallagher was justified in paying more per share to the minority stockholders than it had paid to the majority stockholders. The Scull group controlled 36.5% of the total stock outstanding and was in a position to elect at least one member of the Board of Directors and perhaps block a merger or other corporate action requiring a two-thirds majority vote of the stockholders.

4. Scull had acquired outside interests which he wanted to pursue and testified unequivocally that he was desirous of obtaining a release from his obligations under the employment contract. Paxton & Gallagher was equally interested in cancellation of that contract. Hence there was adequate consideration for the execution of the mutual release.

5. In regard to the manner of distribution neither Scull nor Eskin treated any portion of the $350,000 as being received for cancellation of the contract. Indeed, as the Tax Court found, under the terms of the July 14th agreement the other members of the Scull group could have prevented Scull from appropriating to himself any greater amount than his

proportionate share based upon stock ownership. The entire $350,000 was treated by the Scull group as consideration for the stock, stock options and obligations of Penndale.

6. It was not until July 17th, three days after the contract had been executed and more than two weeks after the terms had been agreed upon, that taxpayer's Board of Directors unilaterally attributed $109,352.02 to the cancellation of Scull's employment contract. Taxpayer did not at any time furnish Scull, as required by Section 6041 of the Internal Revenue Code of 1954, with an Information Return (Form 1099) advising him of this action. The Tax Court did not find this fact alone to be dispositive but merely considered it as another factor indicating that the actions of taxpayer and Paxton & Gallagher were entirely unilateral and not a manifestation of the true agreement between the parties. On this point taxpayer argues that since this item was merely accrued as an expense on its books and not actually paid, it was not required to send the notice. The fact is, however, that it never did furnish Scull with a Form 1099 notice.

■■ As stated at the threshold of this opinion, the question for determination presented an issue of fact for the Tax Court to resolve. We have consistently refrained from trying issues of fact or substituting our judgment for that of the trial court respecting such issues. Our review is limited to ascertaining whether the Tax Court's findings of fact and its inferences from the evidence are clearly erroneous within the meaning of Rule 52(a), Fed.R.Civ.P., as interpreted by the Supreme Court in United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948) and Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). The clearly erroneous rule is applicable to the question whether consideration is paid for stock or for stock and something else. Yandell v. United States, 315 F.2d 141 (9th Cir. 1963); Rogers v. United States, 290 F.2d 501 (9th Cir. 1961); Crown Iron Works

Company v. Commissioner of Internal Revenue, 245 F.2d 357 (8th Cir. 1957).

■ We conclude that the Tax Court's decision that the contract of July 19, 1959 represented the actual agreement of the parties is responsive to and supported by substantial evidence. Accordingly, we affirm.