Robert Bird and Irene Bird v. Commissioner.
Bird v. Commissioner
Docket No. 3773-67.
United States Tax Court
T.C. Memo 1968-275; 1968 Tax Ct. Memo LEXIS 21; 27 T.C.M. (CCH) 1469; T.C.M. (RIA) 68275; December 2, 1968. Filed *21 Martin D. Cohen and Melvin J. Wallerstein, for the petitioners. Frank N. Panza, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar years 1963 and 1964 in the respective amounts of $398.46 and $265.28. The issues for decision are: (1) Whether the amount of $6,000 paid to one of petitioners in each of the years here in issue by a corporation of which he was formerly an employee and stockholder pursuant to an agreement which was entered into in connection with the settlement of a lawsuit is ordinary income or part of the sales price of his stock as capital gains, and (2) Whether petitioners are entitled to reduce the amounts received under the agreement by $750 and $100 in the years 1963 and 1964, respectively, in determining the portion of the amounts received which is taxable, whether an ordinary income or as capital gains. [1]
*22 Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Orange, New Jersey, at the time of the filing of their petition in this case, filed their joint Federal income tax returns for the calendar years 1963 and 1964 with the district director of internal revenue at Newark, New Jersey. They computed their taxable income on the cash method of accounting. Robert Bird will be referred to herein as petitioner, since Irene Bird is involved only because she filed a joint return with her husband. From sometime in 1947 until May 15, 1961, petitioner was an employee and from 1952 until June 8, 1962 a stockholder of Talbot, Bird & Co., Inc. (hereinafter referred to as Talbot-Bird), a corporation with its principal place of business in New York, New York. Talbot-Bird is a closelyheld corporation which has been engaged for many years in the insurance business. Its shareholders created Universal Insurance Company (hereinafter referred to as Universal) a number of years before petitioner became employed by Talbot-Bird. Although a part of Universal's stock is publicly held, Talbot-Bird or its shareholders have retained *23 a majority interest in Universal. Talbot-Bird manages Universal for a commission and also represents certain foreign and domestic companies. Universal is in an automobile insurance business. Petitioner's father prior to his death in the spring of 1951 was a principal shareholder in both Talbot-Bird and Universal and actively participated in the conduct of their businesses for many years. In 1947 when petitioner was employed by Talbot-Bird as an insurance adjuster, his father was chairman of the board of Talbot-Bird. The will of petitioner's father provided that his Talbot-Bird stock should be divided equally among his four surviving children, after taking into account any distributions of such stock which he might have made during his lifetime. The named executors of the will were petitioner's uncle, Harry Bird, petitioner's brother Samuel Curtis Bird (hereinafter referred to as Curtis), John T. Byrne (hereinafter referred to as Byrne) and the Corn Exchange Bank & Trust Co. In 1951 Byrne was a major 1471 shareholder and president of Talbot-Bird. He had been active for a number of years in the business of Talbot-Bird with petitioner's father. Petitioner understood that under *24 the terms of his father's will, he and his two sisters were each entitled to 125 shares of stock of Talbot-Bird. Curtis, who had worked at Talbot-Bird for many years, had already received 128 shares from his father and it was petitioner's understanding that under his father's will Curtis was not entitled to any additional stock. Pursuant to a stockholders' agreement which had been entered into in 1945, ownership of Talbot-Bird stock was restricted to persons who were officers, directors or employees of Talbot-Bird. Petitioner's sisters were not officers, directors or employees of Talbot-Bird. Petitioner was an employee, but was not an officer or a director. Byrne orally informed petitioner in January 1952 that he was being transferred from the employment of Talbot-Bird to the employment of Universal. Petitioner protested that such a transfer would affect his right to hold stock in Talbot-Bird. The following day petitioner received a telegram from Byrne unequivocally confirming the termination of his employment by Talbot-Bird. Petitioner engaged legal counsel to represent him in opposing his transfer from the employment of Talbot-Bird. The matter was resolved by an agreement pursuant *25 to which petitioner was permitted to acquire 97 shares of Talbot-Bird stock from his father's estate and remain in the employ of Talbot-Bird. The agreement as to petitioner's acquiring 97 shares of stock of Talbot-Bird was reached because Byrne was adamant that petitioner and Curtis together should not own more stock than he owned. The remaining shares which were held by the estate of petitioner's father were redeemed by Talbot-Bird. After petitioner acquired 97 shares, the ownership of the Talbot-Bird stock was as follows: John T. Byrne
225 shares
S. Curtis Bird
128 shares
Robert Bird
97 shares
G. W. McIndoe
125 shares
Charles Rosebrock 5 shares 580 shares
As a part of the settlement of the disagreement between petitioner and Byrne with respect to petitioner's employment by Talbot-Bird and acquisition of stock of that corporation, a Stockholders' Agreement was executed on December 17, 1952, in which the stockholders agreed, among other things, that each give the company, as first optionee, and the other shareholders, as second optionee, the right to repurchase his stock at any time he should cease to be an officer, director or employee actively engaged *26 in the company's business, "for any reason other than improper discharge without cause." The exercise price would be 80 percent of the book value as at the immediately preceding December 31st, subject to specified adjustments for goodwill, office furniture and equipment, treasury stock and taxes. The company, if it exercised the option, could deliver Universal stock in lieu of cash, the value of the Universal stock to be calculated at its last closing bid price on the New York Curb Exchange. Notwithstanding other provisions, Curtis was named prior optionee over the company, with regard to the purchase of petitioner's stock. The option was to cover any voting trust certificates which might come into being. In addition to the above arrangement, petitioner and Curtis executed a Voting Trust under which they gave their shares in trust to Byrne for him to vote for a period of seven years. The Stockholders Agreement of December 17, 1952 was amended on April 20, 1959 to specify that in determining the option price at which Talbot-Bird might acquire its stock from a stockholder who ceased to be actively engaged in the corporation's business, the market value, rather than cost, of any stock, *27 including that of Universal, which Talbot-Bird might hold should be used. The Voting Trust terminated in 1959 and petitioner's 97 shares of stock were returned to him. Petitioner remained employed by Talbot-Bird as a claims adjuster until May 16, 1961. He was not an officer or a director of Talbot-Bird at any time. His compensation, including salary and bonuses, during the period from 1952 to June 16, 1961, was as follows: Year
Total
Salary
Bonus
1952
$4,246.73
$4,046.73
$200.00
1953
4,686.90
4,486.90
200.00
1954
4,620.00
4,420.00
200.00
1955
4,725.00
4,625.00
100.00
1956 4,780.00
4,680.00
100.00
1957
5,040.00
4,940.00
100.00
1958
5,379.00
5,179.00
200.00
1959
8,700.00
6,500.00
2,200.00
1960
7,950.00
6,750.00
1,200.00
1961-June 16
3,236.10
3,236.10 1472 Talbot-Bird did not pay any dividends during the years that petitioner held its stock. After the termination of the Voting Trust in 1959, petitioner learned that Talbot-Bird had been making large distributions each year to its officers and directors. All of the shareholders except petitioner were officers and/or directors of Talbot-Bird and they shared in these *28 distributions. The distributions were made in accordance with the terms of Employment Contracts which had been executed in 1952 shortly after the settlement involving the issuance of stock to petitioner and the creation of the voting trust had been entered into. Petitioner was ignorant until 1959 of the existence of the Employment Contracts. The 1952 contracts were similar to previous employment contracts between Talbot-Bird and its officers which had also set forth provisions governing the calculation of salary and bonuses. Petitioner felt that he should have received a part of the yearly distributions, because of his shareholder status. The Board of Directors of Talbot-Bird decided at a meeting on May 16, 1961, that petitioner should be discharged. Byrne and petitioner's brother Curtis participated in this meeting and assented to the resolution. A letter dated that date was directed to petitioner informing him of the termination of his employment. The reasons cited for petitioner's dismissal were that at a stockholders' meeting on February 7, 1961, petitioner had caused his 97 shares to be voted against all but one of the incumbent directors and in favor of his own nominees, including *29 himself and his attorney and that at a meeting of the stockholders of Universal on March 23, 1961, he had attempted to cause the termination of the managerial contract between Talbot-Bird and Universal. The letter further stated: In these and related ways, you have expressed your hostility to our company and your resentment that you have not been promoted to a managerial position. As you know, you have never produced any business for the company or contributed in any substantial way to its activities, or manifested any interest in them. Your employment contract of December 10, 1952, in which you were given permission to buy 97 shares of the company stock, expressly provided that your advancement should be based on merit only, as determined by the Board of Directors. In the same agreement, you joined the other stockholders in promising to do everything in your power to continue the success of the company and to cooperate with its officers. We are satisfied that your continued employment would be detrimental to the interests of the company, and that there is no practical alternative to your immediate dismissal. By letter to petitioner dated May 17, 1961, Curtis stated that he *30 waived his prior option right and Talbot-Bird stated that it exercised its option under the Stockholders Agreement of December 17, 1952, as amended to purchase petitioner's 97 shares of its stock, at a purchase price to be calculated and paid in the stock of Universal. On December 14, 1961 petitioner brought suit against Talbot-Bird and the individual members of its Board of Directors by a Complaint filed in the Supreme Court of New York County, New York. Of the six directors named defendant, four were also officers of Talbot-Bird and three, including Byrne and Curtis, were stockholders of Talbot-Bird. The three stockholder-directors and petitioner were the only stockholders of Talbot-Bird at the time this Complaint was filed. In summary, petitioner's Complaint against Talbot-Bird and its directors alleged that the defendant corporation had been managed so that all profits were distributed to individual directors and officers as salary and bonuses without regard to petitioner's rights as a stockholder; that the corporation had paid no dividends to petitioner during the years he had been a stockholder; that petitioner had received only the salary and bonuses as were set forth therein; *31 that after petitioner had received his stock from the Voting Trust in 1959 he had requested information from the corporation concerning profits but had been refused such information, and that he had filed a petition in April 1961 for an order for inspection of the corporate books and records; that at defendant's request the return date on the order to permit petitioner to inspect the corporate books and records was extended to May 23, 1961; that, on May 17, 1961, defendant corporation discharged petitioner and tried to exercise its option to acquire his stock; that the discharge was improper and the exercise of the option was ineffective so that petitioner was still a stockholder of defendant corporation; that the formula price set forth in the Stockholders Agreement of 1952 made no allowance for the allegedly improper distributions of corporate funds and that the discharge and 1473 exercise of option were part of a conspiracy to defraud petitioner; and that the defendant corporation had lost $708,000 to the benefit of the stockholders of the corporation other than petitioner and officers of the corporation. Petitioner in the Complaint demanded judgment requiring the defendant *32 directors to account to the corporation for the improper distributions and to desist from further distributions, except for basic salaries. On December 22, 1961, petitioner filed a petition for an order to show cause why the defendant directors should not be restrained from payments to officers, directors and shareholders for the year 1961 in excess of regular monthly salaries. In his affidavit attached to this petition, petitioner stated: I have begun this action, which seeks the recovery to the Corporation of the amounts paid to directors in the form of bonuses because these funds were paid from profits made by the defendant Corporation * * * and should have been distributed to all of the stockholders, in the form of dividends. These payments * * * have been in fraud of my rights to dividends as a 17% stockholder * * * The defendants in the Supreme Court suit filed their Answer on January 8, 1962, presenting the defenses that since its incorporation in 1916 the business of Talbot-Bird had been conducted on the basis of a partnership among the managerial officers who have been compensated according to their respective contributions to the earnings of the business and without *33 reference to their stock ownership and that petitioner was entitled to advancement in the corporation only on merit; that no dividends had been paid by the corporation since 1926 and that the directors and stockholders had received no payments other than reasonable compensation for services rendered; and that petitioner's claim was in part barred by the statute of limitations. Defendants counterclaimed that petitioner should be required to surrender his shares in accordance with the Stockholders' Agreement of 1952. Defendants filed a First Amended Answer on February 27, 1962, which did not materially alter the allegations of the Answer. Petitioner's reply was filed in March 1962 setting forth his defenses to the Counterclaim. Petitioner's first defense was that his discharge by Talbot-Bird was without cause and, therefore, defendant corporation had no right to exercise its option under the Stockholders' Agreement of 1952. Secondly, he pleaded that the fraudulent acts of the individual defendants estopped them from asserting the Counterclaim. Thirdly, he alleged that because of the illegal and improper distributions of corporate assets to the other three stockholders, specific performance *34 of the Stockholders' Agreement would result in forfeiture by petitioner as a stockholder of a substantial portion of his interest as a stockholder and would unjustly enrich the other stockholders. In preparation for trial in the Supreme Court of New York County, petitioner's counsel prepared a Trial Memorandum for the judge, in which he presented his arguments in support of an accounting by the directors, recision of the employment agreements, estoppel of the defendants to invoke the statute of limitations and against the right of the corporation to exercise its option to acquire petitioner's stock. At one point in this memorandum, petitioner's counsel wrote - Defendants * * * interpose the statute of limitations as a defense, and at the same time, seek specific performance of the stockholders' agreement. By this course of action, they seek to force plaintiff to surrender his stock at a price which does not take into consideration the corporate moneys which they have fraudulently obtained. Clearly, equity should not permit them to interpose the defense of the statute of limitations * * * This memorandum under the designation "Conclusion" stated as follows: The defendants must *35 account to the corporation for the monies misappropriated and wasted by reason of their actions in violation of their fiduciary obligations as directors and officers, and in the case of the defendant John T. Byrne, as Voting Trustee. Such monies with interest from the date of the wrongful taking should be returned by them to the corporation. Said defendants should be permanently enjoined from distributing the corporate net income to themselves. Also in preparation for trial, petitioner's counsel had his accountant prepare a schedule reflecting the effect that restitution of earnings would have on the per-share value of petitioner's stock. This schedule showed that if there were no restitution, the pershare value at December 31, 1961 would be $1,210 and 80 percent thereof would be $968. If restoration were made for six years, the value per share would be $1,672 and 80 percent thereof would be $1,338. If restitution were made for the full ten years in litigation, the value per share would be 1474 $1,878 and 80 percent thereof would be $1,502. [2]
*36 The suit came to trial on May 18, 1962. After hearing the opening statements, the trial judge informed the parties that he thought that a settlement was possible. The parties agreed to meet that afternoon. The ensuing meetings led to a settlement under which the corporation agreed to withdraw its letter of discharge of May 16, 1961 and petitioner agreed to resign as of that date. It was further agreed that the corporation would buy petitioner's stock at the formula price provided in the Stockholders' Agreement of 1952, as amended and would give petitioner a "consultants agreement" whereby he would be paid a specified amount per year for a period of years beginning as of June 1961 and that the corporation would pay petitioner's attorney fee. The formula price to be paid for the stock was determined on the basis of the stated book value of the stock as of December 31, 1960, which was $1,023.38 per share, 80 percent of which is $818.70. There was no provision for restitution of distributed funds. The settlement was consummated on June 8, 1962. Petitioner gave receipt on that day to Talbot-Bird for 2,811 shares of Universal stock, plus $3 cash, in exchange for his 97 shares of Talbot-Bird *37 stock. The per share value of Universal's stock was set at $28.25. Therefore, the value of the Universal stock received by petitioner plus $3 totaled $79,413.75, [3] or $818.70 per share for 97 shares of Talbot-Bird stock. As a part of the settlement, Talbot-Bird and petitioner on June 8, 1962, executed an "Agreement" which recited that whereas petitioner had been employed by Talbot-Bird from 1947 to May 16, 1961, and Talbot-Bird deemed it desirable to retain petitioner as a consultant, the parties agreed that petitioner would, if requested but not otherwise, act as consultant to Talbot-Bird for 10 years on not more than 3 days a month, 10 months a year and that Talbot-Bird would pay petitioner $6,000 a year payable quarterly effective retroactively to June 1961. The agreement did not specifically state that the $6,000 annual payments were in consideration for services to be rendered by petitioner. It did provide that in the case of petitioner's death prior to the end of the 10-year period, payment would be made to his designated beneficiaries or if none was designated to his legal representatives and that the payments would continue even though petitioner was unable to perform any *38 services because of temporary or permanent physical or mental incapacity. The remaining installments due could be prepaid at any time, without discount, after December 31, 1965. It was understood between the parties that petitioner would never be asked to render any services to Talbot-Bird as a consultant. Petitioner acknowledged by separate letter that the agreement did not make him an employee entitled to hold stock. Petitioner has performed no services under the agreement. On June 8, 1962, petitioner executed a release, releasing the defendants from all right of action which he ever had arising out of the facts upon which the abovedescribed suit had proceeded. On its books, Talbot-Bird treated the payments made to petitioner in 1963 and 1964 as consulting fees and claimed them as deductions for salary expenses on its Federal income tax returns for those years. The claimed deductions were disallowed by respondent as unreasonable compensation and the resulting deficiencies were assessed against and paid by Talbot-Bird. *39 On his income tax return for 1962, petitioner showed a long-term capital gain of $59,745.10 from the sale of Talbot-Bird stock. Petitioner's return showed proceeds of the sale as $89,208 and cost as being $29,462.90. On his income tax return for 1963, petitioner showed $6,000 as proceeds from the sale of Talbot-Bird stock, less $750 cost, for a long-term gain of $5,250; for 1964, petitioner showed $6,000 proceeds, less $100 cost, for a gain of $5,900 on the Talbot-Bird stock. In each of the years 1963 and 1964 the $6,000 amounts shown by petitioner on his Federal income tax return as proceeds from the sale of Talbot-Bird stock represent the payments made to him in accordance with his agreement with Talbot-Bird respecting his being a consultant to that corporation. In his notice of deficiency respondent determined that "the fees paid 1475 to" petitioner in the sum of $6,000 in each of the years 1963 and 1964, represented ordinary income and not capital gains and that the entire $6,000 was includable in petitioner's taxable income in each year. Opinion Petitioner in this case takes the position that a realistic view of the settlement effected between petitioner and the defendants *40 in the suit he instituted in the Supreme Court of New York County requires the conclusion that the $6,000 payments made to petitioner in each of the years here in issue were made in relation to and conjunction with the redemption of petitioner's Talbot-Bird stock. Petitioner contends that it follows from this realistic approach that these payments were in substance additional consideration paid for petitioner's stock and therefore properly treated as long-term capital gain. Respondent's position is that the only amount petitioner received in sale or exchange for his stock was the $818.70 per share he received pursuant to the formula contained in the stockholder's agreement and therefore only this receipt qualifies for capital gains treatment. Respondent argues that since petitioner's essential grievance was that he received no dividends because of misappropriation of corporate earnings by the officer-directors, the $6,000 yearly payments here in issue might be considered as in lieu of dividends and therefore taxable as ordinary income. Respondent states that if the payments are considered as in settlement of a suit for an accounting, such payments are ordinary income to petitioner. *41 Both parties recognize the general principle that proceeds from the settlement of litigation are taxable in like manner to that for which they are a substitute. Raytheon Production Co. v. Commissioner, 144 F. 2d 110 (C.A. 1, 1944), affirming 1 T.C. 952 (1943). However, the parties disagree as to "in lieu of what" the $6,000 yearly payments by Talbot-Bird to petitioner were made. Neither party contends that the amounts were paid for the rendition of services by petitioner. Respondent, in support of his contention that petitioner in his suit sought the recovery of lost dividends, points to certain sworn statements made by petitioner in connection with the suit to the effect that the amounts paid by the officer-directors to themselves in the form of bonuses were in fact distributions of profits of the corporation which should have been distributed to all the stockholders as dividends. Respondent contends that the suit which petitioner brought was based on a claim for an accounting for the corporate profits which should have been distributed as dividends and that amounts paid in settlement of claims for accounting constitute ordinary income. In support of *42 this argument, respondent relies on Commissioner v. Murdoch, 318 F. 2d 414 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court and cases of similar import. Petitioner points out that he was not seeking an accounting of profits to himself, but to the corporation whereas the taxpayer in Commissioner v. Murdoch, supra, was seeking a recovery of profits to himself. Petitioner calls attention to the fact that the Court in Commissioner v. Murdoch, supra, directed attention to the fact that this Court had considered that "the nature and basis of [the taxpayer's] lawsuit and its settlement were revealed in his complaint and the papers which documented the settlement." Petitioner maintains that the allegations of his petition and the relief therein sought were such that a judgment in his favor would have restored funds to the corporation thereby increasing the book value of his stock which Talbot-Bird was seeking to acquire under an option agreement by which price was determined on the basis of book value. Petitioner argues that since the only relief sought in his suit was such as would cause an increase in the value of his stock in Talbot-Bird *43 which he resold to the corporation as part of the settlement, any amount he received as a part of the settlement was received as part of the sales price of his stock. Petitioner states that the substance of the settlement was that everything petitioner received was in payment for his stock and that the transaction should be treated in accordance with its substance, relying upon Samuel D. Miller, 48 T.C. 649 (1967); Albert J. Goldsmith, 22 T.C. 1137 (1954); and Margery K. Megargel, 3 T.C. 238 (1944). Respondent argues that petitioner may not claim that he received the $6,000 in each of the years here in issue as additional payment for his stock because he is bound by the settlement which he made and that under that settlement he received $79,413.75 and no more for his stock. If petitioner is precluded from contending that he received more for his stock than the $79,413.75 which was calculated under the formula of the Stockholders' Agreement, he must fail in 1476 this action, since capital gains are realized only on the sale or exchange of a capital asset. If petitioner did not receive the extra amounts as additional payment for his stock, *44 then he did not receive such amounts for the sale or exchange of a capital asset. Respondent calls our attention to Commissioner v. Danielson, 378 F. 2d 771 (C.A. 3, 1967), certiorari denied 389 U.S. 858, reversing 44 T.C. 549 (1965), in which the Court stated in holding that a taxpayer received ordinary income upon payment to him of an amount under a contract which stated the amount was in consideration for a covenant not to compete, that a taxpayer may not avoid the form of a transaction, if it is accepted by the Commissioner, on the ground that the form of the transaction does not represent the substance thereof except upon a showing that the agreement was forced upon him by fraud, duress, or undue influence of the type which would permit a court to reform the contract. Respondent does not argue that the facts in the instant case are comparable to the facts in Commissioner v. Danielson, supra, or specifically argue that the holding in that case is applicable to the instant case. In our opinion the holding of the Third Circuit in Commissioner v. Danielson, supra, is not applicable to the instant case. In that case *45 a payment was made pursuant to a contract entered into between the parties which contract was unambiguous on its face. Here the amount was paid pursuant to an agreement which was entered into as an integral part of a settlement of a lawsuit and the agreement on its face was ambiguous. Furthermore, respondent in the instant case is not accepting the "form" of the agreement between Talbot-Bird and petitioner insofar as that "form" might be considered to state that the payment of the $6,000 a year for a 10-year period is for petitioner's services. Respondent does not contend that the payments to petitioner were compensation for services or for standing in readiness to furnish services. Respondent argues that the payments were for something other than the form of the agreement would indicate. He contends that the payments were in the nature of dividends or profits. Since neither party asks us to accept the "form" of the agreement with respect to the $6,000 yearly payments as being made to petitioner for services, we must determine from the evidence for what, in substance, these $6,000 payments were made. Respondent argues that petitioner is bound to the formula price as being the only *46 amount received for his stock, not only because he cannot avoid the form of the transaction, but also because the formula price was the bargained-for consideration for the stock under the Stockholders' Agreement and, as to petitioner, represented its fair market value. This argument ignores the fact that petitioner did not attack the formula of the Stockholders' Agreement as such, but only the net worth of the company to which that formula was to be applied. The record shows that petitioner was complaining of the price of his stock under the Stockholders' Agreement because in his view there was error in one of the factors which went into the formula. The formula depended upon the book value of the stock and the book value of the stock was dependent upon the net worth of a corporation. Since the net worth of a company is reduced by distributions of earnings and enlarged by their retention, petitioner sought restitution of allegedly improper distributions so as to increase the value of his stock. Petitioner was not contesting the fairness of the formula, but was pursuing a course which could result in the formula producing a higher price for his stock. Since petitioner was contesting *47 the amount to which the formula was to be applied, respondent's statement that the "fair market value" of the stock to petitioner was the price at which he was bound to sell under the formula of the Stockholders' Agreement begs the question here involved and the cases cited by respondent to the effect that the "fair market value" of stock was limited by an option to sell are not helpful in resolving the issues herein. The evidence clearly shows that the "Consulting Agreement" was a sham insofar as any payment specified therein purported to be for services to be rendered by petitioner. The testimony of several witnesses was unequivocal that there was no expectation by either party that petitioner would be consulted, and he has not been. Furthermore, neither petitioner's death nor disability would have relieved Talbot-Bird of its obligation to pay the 10 yearly payments of $6,000. In addition, Talbot-Bird was free after 1965 to prepay the balance due under the agreement. From respondent's argument, he also appears to regard the "Consulting Agreement" to be a sham insofar as any payment therein is indicated to be for services to be rendered by petitioner. He argues that the $6,000 *48 payments are ordinary income because they 1477 represent dividends or an accounting to petitioner for earnings and profits, not because they are compensation for services. Since payments under the agreement were not for "services" we must determine "for what" the $6,000 yearly payments were made from the pleadings in and the facts surrounding the lawsuit and its settlement. The evidence is clear that the agreement for the $6,000 yearly payments was an integral part of the settlement of the lawsuit and we have made a finding to that effect. The pleadings, the trial memorandum and the testimony reveal that petitioner had incurred the displeasure of the directors and officers of Talbot-Bird to such a degree that the result was his dismissal from the employ of the corporation and the attempt by the corporation to redeem his stock. Petitioner, taking the position that his discharge was improper and without cause and that his shareholder status was therefore unaffected by his dismissal, brought suit to require a return to the corporation of allegedly improper corporate distributions. In the complaint instituting his suit in the Supreme Court of New York County, petitioner did not *49 seek a monetary recovery for himself, in any form. The defendants, by counterclaims, injected the redemption of stock issue into the lawsuit. Petitioner took the position that because of the improper distributions made to the other stockholders the redemption of his stock under the formula price would constitute a forfeiture of a substantial portion of his stockholder interests. The issues between the parties in the litigation which was settled in June 1962 were that petitioner sought restoration of the corporate surplus to the corporation and the defendants sought the redemption of petitioner's stock in the corporation. Petitioner was not questioning the right of Talbot-Bird to dismiss him without cause but only the right of the corporation to redeem his stock after such a dismissal. If petitioner resigned Talbot-Bird would be entitled to redeem his stock under the formula. However, if petitioner were successful in his position in the litigation the formula price of his stock would be greatly increased. In June 1962 the parties to the litigation agreed that (1) Talbot-Bird would withdraw its letter of May 16, 1961, discharging petitioner; (2) petitioner would resign as of that date; *50 (3) petitioner would sell his stock to Talbot-Bird; (4) petitioner would receive $79,413.75 under the formula of the Stockholders' Agreement of 1952, as amended, and (5) petitioner would receive $60,000 over a period of 10 years under a so-called "Consultants Agreement." The substance of the settlement was that petitioner agreed to leave Talbot-Bird and to sell his stock to the corporation in exchange for $79,413.75 cash, plus $60,000 over a period of time. Petitioner was not entitled to any compensation for past or future services. The $6,000 yearly payments cannot be regarded as consideration for cancellation of employment, any more than they can be regarded as compensation for personal services under the Consulting Agreement. Cf. Coca-Cola Co. v. Commissioner, 369 F. 2d 913 (C.A. 8, 1965), affirming a Memorandum Opinion of this Court. In order to acquire petitioner's stock, Talbot-Bird had to compromise petitioner's claim that the surplus of the corporation be restored. The inevitable result of settling petitioner's claim was an increase in the amount he would receive for his stock. The $6,000 yearly payments were in substance made to effect a compromise of the price *51 of petitioner's stock. These payments therefore were in the nature of payments for the purchase of petitioner's stock. See Lyeth v. Hoey, 305 U.S. 188 (1938); Margery K. Megargel, supra; Albert I. Goldsmith, supra; and Commissioner v. Murdoch, supra. The record contains no satisfactory explanation for the use of the "Consulting Agreement" as a vehicle for the payments. The attorney who represented petitioner in the litigation stated in his testimony that he did not remember who suggested the "Consulting Agreement" but that such an agreement was a "common device." One of the defendants' attorneys after reviewing his "engagement records" for the latter part of May 1962, stated that the "principles" of the settlement were outlined by petitioner's attorney. We consider it immaterial who "proposed" the "device" of a "Consulting Agreement," since the evidence is clear that none of the parties or their attorneys ever intended that petitioner render any consulting services to Talbot-Bird. See Albert J. Goldsmith, supra (22 T.C. at 1145). As respondent points out a stockholder who sues for corporate profits and ultimately *52 recovers his share of earnings has received ordinary income. If he settles the suit for profits the amount he receives in settlement is likewise ordinary income. Commissioner v. Murdoch, supra.If a stockholder sues for restitution of earnings to a corporation and succeeds, the value of his stock is thereby increased but he receives no income 1478 until he disposes of his stock. If he settles such a suit and the result is a payment only to the corporation with the stockholder retaining his stock, he has effected an increase in the value of a capital asset but received no income. However, if the result of the settlement in substance and effect is a sale of his capital asset at an appreciated price because of his position that restoration should be made to the corporation, thereby increasing the value of his capital asset, he may have a taxable gain. Since the substance of the transaction is a sale of stock which has appreciated in value, such gain is a capital gain. See Margery K. Megargel, supra (3 T.C. at 246). Respondent in his brief states that another factor reflecting the correctness of his determination is that "In computing the amount realized *53 on the sale of his stock on his income tax return for the taxable year 1962, petitioner did not include the value of the consulting agreement, and he did not attempt to elect the installment sales provision of the Internal Revenue Code." [4] If respondent is suggesting in this argument that the "Consulting Agreement" had an ascertainable fair market value, the amount of which should have been included in petitioner's income or in the sales price of petitioner's stock in 1962 with a portion of the $6,000 received in each later year allocated to recovery of the amount included in income in 1962 and the balance included in his income in the later year, this is an issue raised for the first time by respondent on brief and therefore is not properly before us. See Campagna v. United States, 290 F. 2d 682 (C.A. 2, 1961) cited by respondent. Such a theory is inconsistent with respondent's determination including the entire $6,000 received by petitioner in his taxable income in each of the years 1963 and 1964 as ordinary income received in those years. For this question to be properly raised it would have been incumbent on respondent to file an appropriate pleading placing the matter *54 in issue. Respondent contends that in his notice of deficiency he did not allow the deductions of "basis" in the amount of $750 and $100 for the years 1963 and 1964 claimed by petitioner on his income tax returns and that petitioner has failed to prove that the claimed deductions are proper. We agree with respondent. By including the entire $6,000 in petitioner's taxable income for each of the years 1963 and 1964, respondent disallowed the claimed "basis" deductions. Petitioner has totally failed to show that his entire basis in his Talbot-Bird stock was not recovered in 1962. We, therefore, hold that the entire $6,000 received by petitioner from Talbot-Bird in each of the years 1963 and 1964 represents capital gain from the sale of his Talbot-Bird stock. Decision will be entered under Rule 50. Footnotes
1. Petitioners in their brief state: Petitioners abandon their alternative contention relating to deduction of legal expenses in 1963 and 1964. However, since respondent did not challenge, either in the deficiency notice or in his answer, the basis claimed by petitioners in the respective amounts of $750.00 and $100.00 in computing capital gain with respect to Robert's Talbot-Bird stock for 1963 and 1964, there is presumably no issue as to petitioners' right to claim such basis. However, petitioners request as an ultimate finding of fact the following: 57. It is proper for petitioners to capitalize and prorate the $10,000.00 legal fee which Robert paid to his attorneys for the handling of the derivative stockholders action on his behalf, resulting as it did in the settlement including the payment to Robert of $60,000.00 under the so-called "consultation agreement." Respondent in his reply brief objects to this ultimate finding as inaccurate and unsupported by the record. As will hereinafter be pointed out, respondent in his notice of deficiency did in fact disallow to petitioner the claimed "basis" of $750 and $100 in the years 1963 and 1964, respectively, since he included in petitioners' taxable income the entire $6,000 received by petitioner from Talbot, Bird and Company, Inc. in each of those years. In our view, therefore, there still remains in this case the issue of petitioner's claimed reduction for "basis" in each of the years.↩
2. The record does not show whether the figures are accurate but only that they were used by petitioner's attorney in preparing for the trial. Eventual evaluation was made as of December 31, 1960, in accordance with the Stockholders' Agreement provision that it would be made as of the year-end preceding the date on which employment was terminated.↩
3. At one place in the stipulation this figure is given as $78,413.75. At another place it is given at $79,413.75. The latter is obviously the correct figure.↩
4. At another point in his brief respondent states that "Petitioner did not report the value of the consulting agreement as consideration received on the sale of his stock on his income tax return for the taxable year 1962, but now contends that all amounts received under that consulting agreement are entitled to treatment as long-term capital gain."↩